**Jimmie Ben DANDRIDGE, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. A–18113.**

Court of Criminal Appeals of Oklahoma.

Nov. 6, 1973.

Rehearing Denied March 14, 1974.

E. Terril Corley, Asst. Public Defender, Tulsa County, for appellant.

Larry Derryberry, Atty. Gen., Fred H. Anderson, Asst. Atty. Gen., Kenneth L. Delashaw, Jr., Legal Intern, for appellee.

## OPINION

BLISS, Presiding Judge:

Appellant, Jimmie Ben Dandridge, hereinafter referred to as defendant, was charged and tried in the District Court, Tulsa County, Case No. CRF–72–1723, for the offense of Murder. Defendant was convicted of First Degree Manslaughter, with his punishment being fixed at twenty-three (23) years imprisonment, and from said judgment and sentence, an appeal has been perfected to this Court.

Briefly stated, the evidence adduced at the trial reflects that the decedent, Bess Moss, was found dead at her residence on September 10, 1972. The cause of death was determined to have been a subdural hemorrhage, brought about by a severe beating inflicted upon the deceased.

At the trial, Mary Lou D'Arcy testified that she had known the deceased for approximately a year prior to her death and had lived next door to her (Tr. 6). She stated that on September 9, 1972, the de-

ceased and the defendant visited with the witness and her husband in the witness' backyard (Tr. 7). During this time, other neighbors, Mrs. Gilson and Mrs. Newkirk, came over to visit. Further, during this time Mrs. Moss' daughter, Susie, also came over to borrow an automobile from the deceased (Tr. 8). Later the deceased wanted to go to the bathroom and the witness accompanied her to the same (Tr. 19). At that time, the witness noted a bruise across the defendant's face and she related that she conversed with the deceased for ten to fifteen minutes in the bathroom (Tr. 11). The witness testified that the deceased and the defendant left the backyard and went home at approximately 8:55 p. m. On the date in question, the witness retired to bed at approximately midnight and next saw the defendant at approximately 8:30 a. m. the next day. The witness related that she was having coffee in her backyard and observed the defendant coming out of the back door of the deceased's home with a bottle of beer in his hand, wherein the witness and the defendant conversed in the witness' backyard for approximately thirty minutes. At that time, Mrs. D'Arcy asked the defendant if they "forgot to get up and go fishing" and the defendant responded that he had tried to get "Bess" up since 4:00 a. m. and was unable to do so (Tr. 15). The defendant advised the witness that while sitting on the back steps on the previous evening he had heard an argument in the back bedroom at approximately midnight and stated Mrs. Moss, the deceased, was arguing with another lady "about a person by the name of Lester." The defendant said that the stranger was larger than the witness and wore her blond hair in a pony tail (Tr. 16). The defendant stated that he had pulled the stranger off of the deceased and "knocked her out of the door." Mrs. D'Arcy then stated that following the conversation, the defendant went home and returned to her house at approximately 10:55, wherein he approached the witness and stated, "Mary Lou, how much do you love people this morning." The witness responded, "Some

a lot, some I don't give a damn about." The defendant stated, "If you love Bess you will go see if you can get her awake." Thereupon the witness proceeded to the deceased's home and observed the deceased lying on her back, wherein the witness stated, "You'd better get some help because she is going to need some help to come out of this one." The defendant then replied, "Don't get anybody." The witness related that the deceased had bruises on her face, a "busted lip," bruises on her cheek, and a big bruise under her left arm (Tr. 17, 19, 20). The witness further stated that the deceased's left leg was "all bruised" and had a cut on it (Tr. 21). Mrs. D'Arcy stated that while in the bathroom with the deceased, Mrs. Moss had said to her "Mary Lou, why don't you look at my face . . . That S.O.B. hit me in the face with an electric fan" (Tr. 23). The witness further testified that at another time the deceased had stated to her, "Mary Lou, if you ever hear any screaming, I want you to call the police . . . Jim is going to hurt me real bad one of these days" (Tr. 24). The witness stated that the deceased had advised her that she could not leave because the defendant had threatened to cut Cindy's throat if she did (Tr. 25).

William H. D'Arcy, husband of the above witness, substantially corroborated his wife's testimony. He added that he had been drinking beer with the deceased and the defendant in the backyard on the evening in question and stated that the deceased appeared sober (Tr. 24). He also added that he had accompanied his wife over to the house with the defendant on the following morning (Tr. 46).

The State's next witness was Melissa Roberson. She stated that on the evening in question she had gone to a birthday party with her boyfriend, Bo Berrick, and arrived at Becky Bernard's at approximately 9:40 p. m. She stated that the home of Becky Bernard abuts the deceased's backyard (Tr. 52). The witness stated that she remained at the party for approximately fifteen minutes, left, and decided to walk

around the corner to Bess Moss' house (Tr. 52). The witness knocked on the door and through the window observed the deceased and the defendant on a couch (Tr. 56). The defendant responded by getting up to see who it was and said, "Just a minute" wherein he returned to talk to the deceased. The witness waited for approximately a minute, whereupon the defendant came to the door and let the witness in (Tr. 57). The defendant stated that he and the deceased were drunk and kept offering the witness a drink, but she refused. She stated that she observed no beer or drinks around (Tr. 58). The deceased asked the defendant for a cigarette and took a ball point pen from his hand thinking it was a cigarette, put it in her mouth, and just prior to lighting the same, the witness advised her that it wasn't a cigarette and the deceased put it down. (Tr. 60). The witness related that the deceased had her head on the back of the couch, that she pushed herself up and staggered over to the witness, wherein the defendant observed a cut on the left hand corner of her mouth. The deceased told the witness "Melissa, baby, I love you." The witness smelled no alcohol on the defendant's breath and observed that the defendant had followed the deceased over to the witness (Tr. 62). The witness further observed that the deceased looked drowsy, noticed her to be incoherent, and that she slurred her words (Tr. 63). When the witness decided to leave, the deceased wanted to walk her out into the backyard, so the witness and the defendant helped her (Tr. 64). Melissa Roberson further stated that she had seen the deceased drink, but that she was a "happy drinker," she never staggered, or slurred her speech (Tr. 65). Bo Berrick, the witness' boyfriend, came over to the backyard whereupon the defendant apparently acknowledging that the witness and Mr. Berrick had had an argument, stated to the boyfriend, "I think I had better teach him a thing or two" (Tr. 66). The witness further related that she had seen the deceased around the last of August and observed that she had a black eye and bruises all around her eye. The defendant told the witness, "She got it when they went to Ft. Smith, Arkansas." The witness stated that she was told Mrs. Moss had been attacked at a bar by two men and two women (Tr. 70). The witness finally stated that the deceased, while laying her head on the couch, would hold her head up and rub the side of her face where she had the cut (Tr. 74).

Cindy Moss, daughter of the deceased and the State's next witness, testified that on the day in question she had also attended the birthday party at Becky Bernard's (Tr. 77). She stated that she observed the defendant when she drove up to her mother's house, but that she just walked by to go to the party. The witness also stated that she sat on her sister's back porch from approximately 3:00 to 4:00 a. m. and observed the defendant walking in and out of the house and that he turned the lights on and off many times (Tr. 78). The witness stated that her car and another girl's were parked behind the defendant and he kept going out to walk around the cars, whereupon the witness said, "Jim, I will move my car in a few minutes." He said in response, "Look, I am not going to put up with the goddamn shit anymore." The witness left the party shortly thereafter (Tr. 79). The witness also stated that the defendant and the deceased had gone to Ft. Smith around August 1st and that the deceased had returned with a black eye and bruises on her arms (Tr. 80). The witness also testified that approximately three weeks before her death, the deceased had a "place on her mouth" and she advised that it was a "tooth problem" (Tr. 81). The witness at that time told the deceased to go to the doctor about it in the defendant's presence, but the deceased said "Hush, hush." On September 7, the witness went out to eat with the deceased and observed that she was unusually nervous (Tr. 82). The deceased had told the witness approximately two weeks after the defendant had moved in that "he was insanely jealous" (Tr. 86).

Susie Moss, another daughter of the deceased, next testified that she lived with Becky Bernard (Tr. 87). The witness asserted that she had gone to the D'Arcy's backyard on the evening in question to borrow a car and observed a bruise on the deceased's face, but when questioned about it, the deceased would not respond (Tr. 88, 89). The witness stated that since the defendant had begun living with the deceased, the deceased was "bruised up a whole lot" (Tr. 92). Approximately two weeks before her death, Mrs. Moss had told the witness, "She was really scared, that she wanted to get out of the relationship, that she wanted to get out of it graciously without any of us getting hurt" (Tr. 96).

Larry Moss, on direct testimony for the State, stated that he resided with his mother until the defendant moved in (Tr. 99). He related the Ft. Smith black eye story, but added that he was advised the bruises were in part caused by a radiator cap popping off and hitting the deceased in the face (Tr. 102). He further stated that the deceased had advised him that the defendant was very jealous and that he accused her of having sexual relations with the witness' friend (Tr. 103). The witness also stated that prior to knowing the defendant, the deceased had to his knowledge, never been in a fight with anyone (Tr. 107).

Melissa Roberson was recalled to the stand and related that when she returned from the deceased's home on the evening in question, she noticed dry blood on her face (Tr. 110). She further related that she could not ascertain from where it came, but said the deceased had put her hands on the witness' cheeks (Tr. 113, 114).

Kenneth Franklin Spitter, a Tulsa policeman, stated that on September 10, 1972, he proceeded to the deceased's residence (Tr. 114). The officer testified that he and Lieutenant Harper arrived there with an ambulance, whereupon Mrs. Moss was found to be dead (Tr. 115). The defendant advised the witness that during the night a large, "black headed" woman had come into the house and had beaten and "stomped" Mrs. Moss. The officer stated that the defendant told him he did not know who the individual was and added that there had been a man outside leaning by a black Lincoln Continental (Tr. 116). The defendant further advised the witness that the woman was "stomping" on the deceased and beating her with a thin twisted wire (Tr. 117). He related that the defendant helped the deceased into the bedroom and treated her wounds and woke her up at approximately 5:00 a. m. and asked the deceased how she was feeling, whereupon the deceased responded that she was fine and was still going fishing (Tr. 118). The witness also stated that the defendant had advised him that at approximately 9:00 a. m. the deceased was not feeling well and when he checked upon her at 10:00 a. m., the deceased was cold and he then went to the D'Arcy's (Tr. 119, 120).

D. A. Roberts, a Tulsa police officer, stated that he investigated the homicide in question on the morning of September 10, 1972 (Tr. 124). Upon entering the bedroom to observe the body of the deceased, he noted that she was nude except for a panty girdle, had in excess of one hundred bruises or lacerations about her body, and related that almost every square inch of her body from the top of her head to her ankles had some mark on it (Tr. 125). He identified the State's exhibits as photos taken of the body as accurate representations of the condition the same was in when found (Tr. 127). The officer further related that he observed no drinking glasses or beer cans in the residence and further recalled the defendant's story of how the injuries came about (Tr. 130, 132).

The State then called Dr. Robert Fogle, a pathologist, who testified that he had performed the autopsy on Bess Marie Moss on September 10, 1972 (Tr. 145). The doctor testified that his examination revealed that the injuries did not occur at

any one particular time and that some were recent and some as old as twenty-four hours (Tr. 148). He further testified that the cause of death was acute subdural hemorrhage caused by a blow or a fall (Tr. 149). The witness also stated that the early effects of such condition would be confusion, instability of motion, etc. The witness also added that the instrument which caused death was one blunt in nature and could have possibly been a fist or a flat piece of wood (Tr. 161).

Celia Newkirk, a neighbor of the deceased, stated that she saw the deceased in the D'Arcy's backyard on September 9, 1972 (Tr. 170). The witness related that she and a Mrs. Gilson conversed with the deceased and observed Mrs. Moss to be scared and that she advised them that the defendant slept with a knife at her throat every evening. The witness suggested that the deceased seek assistance and the deceased responded that the defendant had threatened her children and didn't want to jeopardize them (Tr. 172).

Mary Gilson, corroborated the above conversation and added that the deceased seemed to be sober and did not slur her words (Tr. 181, 182, 183).

The defendant, Jimmie Ben Dandridge, then took the stand on his own behalf. He stated that he was an interior decorator by profession, had never been convicted of a felony, and his only misdemeanor convictions were barroom fights and assaults. He stated that he met the deceased in a bar around July 20th, and that following that evening he and the deceased began living together (Tr. 190, 191). The defendant stated that he and Mrs. Moss decided to go fishing on the morning following the evening in question and confirmed that the parties had been drinking beer in the D'Arcy's backyard (Tr. 196, 197). After leaving the D'Arcy's, the defendant and the deceased continued consuming alcoholic beverages and after approximately one hour, the deceased laid down in the living room and went to sleep. The defendant stated that he went out to his back porch, sat down, and observed a party going on at Susie Moss' house (Tr. 200). The defendant stated that he returned inside the house to secure another beer and went back to the backyard for further observation. Shortly thereafter, he heard a noise and ran into the house and saw the deceased on the floor (Tr. 201). He stated that he saw a woman in the living room beating and kicking the deceased and that when she noticed the defendant, the assailant screamed and left the room. The defendant went to the deceased, picked her up and put her in a chair. The defendant testified the assailant was still in the house cussing, and that she said, "You son-of-a-bitch, I will kill you." The defendant turned toward the woman and she backed out the door and left and the defendant related deceased did not know who the individual was (Tr. 202). The defendant also testified that the woman was large, and husky and had short hair like a nurse (Tr. 203). The defendant related that the deceased refused medical assistance saying, "I don't want the kids to know about it and worry about me" (Tr. 204). The defendant also stated that he attempted to clean and dress the deceased's wounds, placed her on the bed and that he remained awake for the remainder of the evening drinking beer (Tr. 208). He testified that at 6:00 a. m. the deceased advised him that she felt all right, and thereupon, the defendant went to get a six-pack of beer. He stated that at approximately twelve minutes of eleven, he attempted to wake up the deceased and that she did not respond to his efforts (Tr. 209). The defendant testified that he then got scared and ran over to the D'Arcy's. He also stated that he had a good relationship with the deceased and that he never struck her (Tr. 210). The defendant also disputed Mrs. D'Arcy's testimony that he talked to her about 8:30 a. m. and further stated that he did not tell Mrs. D'Arcy that a blond woman with a pony tail attacked the deceased. The defendant added that he did not tell Mrs. D'Arcy he threw the woman out the front door (Tr. 212). He added

that the deceased was not drunk and that the people who said that she slurred her words were incorrect (Tr. 213). The defendant also added that he never noticed a cut on the deceased's lip or bruises on her face (Tr. 216). The defendant stated that Melissa Roberson was not in his house on the evening in question and that he never told Melissa he was going to "beat her boyfriend" (Tr. 219).

On rebuttal, the State called Bo Berrick to the stand. He related that on the evening in question he attended Becky Bernard's birthday party with Melissa Roberson (Tr. 257). He stated that he and Melissa were arguing that evening and that while standing on the back porch of the house at which the party was held, observed Melissa and the deceased standing near the back step of the deceased's residence. He also stated he saw a third party leaning against a car next to the door (Tr. 258). He observed Melissa grab the deceased by her arm and open the door for the deceased and that Mrs. Moss grabbed the door at the edge. He stated that Mrs. Moss was uncoordinated, unsteady and couldn't walk. He further observed that Melissa then talked to the figure standing next to the car and returned to the party with red marks on her cheeks which he thought to be blood (Tr. 260).

■ Defendant's first proposition of error claims certain testimony concerning alleged statements by the deceased should not have been admitted into evidence, that said statements were hearsay and did not fall within any exception to the hearsay rule, and that said testimony was extremely prejudicial to defendant's cause.

The statements of which the defendant complains consist of testimony by certain of the witnesses made out of the defendant's presence relating to the decedent's expressions of fear of the defendant and certain acts of hostility the defendant allegedly perpetrated against her prior to her death.

While defendant concedes that he has no quarrel with the principle that evidence of prior mistreatment by the defendant of a victim is admissible, he asserts that such rule should not be allowed to stand when said evidence is introduced as an exception to the hearsay rule.

In Brewer v. State, Okl.Cr., 414 P.2d 559 (1966), the Court held that generally hearsay evidence made out of the presence of the defendant is inadmissible. However, in Lowrey v. State, 87 Okl.Cr. 313, 197 P.2d 637 (1948), the trial court allowed the deceased's father, Bob Butler, to testify to statements made by the deceased (his daughter) and out of the presence of the defendant. On appeal, this Court held:

"We are of the opinion that the foregoing proof offered by Bob Butler relative to his daughter's desiring a transfer, because she was scared of defendant is admissible, but, we are further of the opinion that the scope of such evidence should be limited to the purpose of showing the state of mind toward the defendant, and is not to be used as proof of the fact stated." 197 P.2d at 651.

It should be noted that the court's instruction number five in the instant case complied with the court's requirement in Lowrey, supra, in that it restricted use and weight of the evidence complained of to the purpose for which it had been admitted, i. e. to show decedent's state of mind toward defendant. We therefore find defendant's first proposition of error to be without merit.

■ Defendant's second proposition of error asserts that he was denied fundamental due process because of his inability to cross-examine a police officer regarding an alleged admission.

The testimony of the officer had been given at the preliminary hearing, but was suppressed prior to defendant's trial. The State on cross-examination of the defendant read the officer's testimony in order to impeach the defendant and affect his credibility. Defendant promptly objected and moved for a mistrial which was denied. The defendant suggests the reading of the testimony of Officer Johnson directly from

the preliminary transcript in front of the jury deprived him of his Sixth Amendment right to be confronted by witnesses against him.

There is much authority as to the right to impeach a witness by use of prior inconsistent statements. See Brooks v. United States, 309 F.2d 580 (10 Cir. 1962), Leeper v. United States, 10 Cir., 446 F.2d 281, cert. denied, 404 U.S. 1021, 92 S.Ct. 695, 30 L.Ed.2d 671 (1972), and Lewis v. State, Okl.Cr., 458 P.2d 309 (1969). Nevertheless, the defendant requested of the court that he be allowed to call the officer in question so that he could cross-examine him, said motion being overruled. This Court is of the opinion that calling the officer was not required. In Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed. 2d 1 (1971), it was held that although the accused's prior inconsistent statements, which he did not claim were coerced or involuntary, had been made to the police under circumstances rendering them inadmissible to establish the prosecution's case in chief under Miranda v. Arizona (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 ALR3d 974, such statements could properly be used to impeach his credibility, since the shield provided by the Miranda Case could not be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances.

■ Additionally, since the trial court instructed the jury to disregard the testimony in question, we fail to see where the defendant was harmed. It is to be noted that while the defendant was charged with Murder, he was found guilty of First Degree Manslaughter, thus indicating that the jury properly followed the court's instruction to disregard the officer's testimony. Defendant's second proposition of error is therefore without merit.

■ Defendant next asserts error of the trial court in admitting photographs of the deceased which inflammed and prejudiced the jury. This proposition is totally devoid of merit.

The question of admissibility of photographs in evidence is a matter addressed to the discretion of the trial court. Snake v. State, Okl.Cr., 453 P.2d 287 (1969). Additionally, this Court in the recent case of Vavra v. State, Okl.Cr., 509 P.2d 1379 (1973) held that photographs which were faithful reproductions of the scene of the killing and which showed location, nature and extent of the victim's wounds and illustrated pathologist's conclusion that cause of death was indicated from innumerable bruises, were relevant in murder prosecution, their probative value outweighed their prejudicial effect and they were properly admitted. In the instant case, we do not feel that the photographs were gruesome, hence, they were properly admitted.

■ Defendant's fourth proposition asserts that the verdict was contrary to the evidence. With this contention we cannot agree. A thorough and complete reading of the record amply supports the jury's verdict. This Court has consistently held that where there is competent evidence in the record from which the jury could reasonably conclude that the defendant was guilty as charged, the Court of Criminal Appeals will not interfere with the verdict, since it is the exclusive province of the jury to weigh the evidence and determine the facts. Turner v. State, Okl.Cr., 479 P. 2d 631 (1971).

■ The final proposition contends that the punishment is excessive. Since the defendant was charged with Murder, but was convicted of Manslaughter in the First Degree and sentenced to twenty-three years when he could have been assessed life imprisonment, we cannot conscientiously say that the punishment imposed shocks the conscience of this Court. The judgment and sentence is accordingly affirmed.

BRETT and BUSSEY, JJ., concur.