Earl Junior SALLEE, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–75–95.

Court of Criminal Appeals of Oklahoma.

Dec. 17, 1975.

Rehearing Denied Jan. 26, 1976.

As Amended Feb. 27, 1976.

Richard James, Stroud, for appellant.

Larry Derryberry, Atty. Gen., Frank Muret, Asst. Atty. Gen., for appellee.

## OPINION

BLISS, Judge:

Appellant, Earl Junior Sallee, hereinafter referred to as defendant, was charged, tried before a jury and convicted in the District Court of Lincoln County, Case No. CRF-74-1, for the offense of Murder in the Second Degree. Punishment was assessed at an indeterminate sentence of ten (10) years to life imprisonment. From said judgment and sentence he has perfected this timely appeal to this Court.

Briefly stated, the evidence adduced at trial is as follows: Lincoln County Deputy Sheriff Ted O'Donnell testified that on December 30, 1973, at approximately 10:50 p. m. he was dispatched to the Earl Sallee residence located in Sparks, Lincoln County, Oklahoma. Upon arrival, he and Highway Patrol Trooper Pierce were met by defendant who motioned them inside and advised them that his wife was seriously hurt. Upon walking into the bedroom, he observed Mrs. Sallee lying in the bed. Her head was profusely bleeding and she was gasping for breath. A Chandler ambulance arrived simultaneously and she was placed on a stretcher and transported to a hospital. In the doorway between the bedroom and kitchen Pierce found a hammer with traces of blood and hair on it. O'Donnell described the defendant as being nervous, concerned about his wife, cooperative and not intoxicated. After being advised of his rights, the defendant made a statement wherein he related that he woke up standing beside his wife's side of the bed, that there was a hammer on the bed and that he then proceeded across the street to call an ambulance and the Sheriff.

Trooper Gary Pierce of the Oklahoma Highway Patrol then related substantially the same sequence of events as O'Donnell adding further that defendant stated that approximately thirty minutes after going to bed his youngest daughter, who was sleeping in the same bed as he and his wife, woke him and that he took her to the bathroom, and then returned to bed. The next thing he recalled he was standing by his wife's side of the bed and a hammer was lying on the bed beside her.

Robin Melott, the twelve year old stepdaughter of the defendant testified that on the above date she returned home from church at approximately 8:30 p. m., found the family watching television and joined them. Shortly thereafter the family went to bed and she heard both her mother and the defendant snoring. She twice heard someone enter and leave the bathroom and then heard her mother gasp. Following the gasp, the defendant entered the living room where she was sleeping on the sofa and stated that he must have taken the hammer from the bathroom and struck her mother on the head while walking in his sleep. After telling her not to touch anything because his prints were on the hammer, he went to a neighbor's home to call the police and ambulance. On cross-examination she further related that on the day in question the whole family was at home and there were no arguments. On re-direct she related that approximately two weeks earlier her mother and step-father had an argument during which he threatened to kill all of them. She further stated they only argued when the defendant was drinking and he had not been drinking on the 30th. However, she then stated that on earlier occasions she had observed bruise marks on her mother caused by the defendant.

Fred B. Jordan, forensic pathologist and medical doctor, then testified he performed an autopsy on the deceased on December 31, 1973, and determined that her death came as a result of trauma to the head caused by a blunt instrument. He further stated that the hammer in question could have caused the wounds.

Katherine Graham, a neighbor, testified that on December 20, 1973, she observed defendant and Mrs. Sallee fighting in front of their residence and overheard him threaten to kill her and the family. The following morning the deceased was in her home and the witness observed bruises on her chest. The deceased told her that she feared defendant and was concerned about the safety of herself and her children. On cross-examination the witness stated that "you couldn't ask for a nicer man" when the defendant wasn't drinking. She further stated that the deceased told her the defendant was drunk on the night of the 20th and that he had threatened to kill them all "before the year was out." The State then rested.

Goldie Tidswell testified that she was defendant's mother and that as a child he had a history of sleepwalking. She related incidents where defendant, apparently in a state of sleepwalking, struck his brother, broke a window with a stick of firewood, and in August of 1973 beat on the head of his bed with his fists. He did not have recollections of the incident afterward. She further stated that her other children had walked in their sleep.

Bobby Sallee, defendant's brother, then related several instances where defendant struck him during the night while apparently in a state of sleep. On another occasion the defendant attempted to crawl out of a second story window in his sleep. The defendant had no recollection of the incidents after he awoke.

Defendant then testified in his own behalf stating that he was thirty-five years old, had a seventh grade education and married the deceased in 1968 after his first

marriage ended in divorce. He then stated he had no recollection of the sleepwalking incidents mentioned by his mother and brother. He then testified concerning the argument with the deceased on December 20, 1973, stating that he was intoxicated and that drinking was the cause of all their domestic quarrels. He and his wife made up on the 21st and had no subsequent disagreements. He could not recall making threats to kill the family.

The defendant then related that on the night of the 30th he, their five year old daughter, Alice, and the deceased slept in the same bed as usual. Shortly after they went to bed he took Alice to the bathroom and then returned to bed and went to sleep. The next thing he recalled was awakening while standing next to his wife's side of the bed. There was a hammer lying on the bed next to her and she was bleeding and breathing hard. He then got the children up and went to notify the police and call an ambulance. He then waited in the bedroom with his wife until help came. He further testified he loved his wife and had no recollection of anything after putting Alice back in bed and going to sleep until he woke up standing by the bed.

Dr. Moorman Prosser, a specialist in psychiatry, then testified he conducted two examinations of the defendant subsequent to December 30, 1973, as well as numerous tests. As a result of the tests he determined the defendant had a hysterical personality, the type of personality which is consistent with sleepwalking.

Jay Talmadge Shurley, a medical doctor who specializes in psychiatry and has done research in the area of sleep disorders, testified that on May 31, 1975, he conducted an all night polygraph examination of defendant. Dr. Shurley concluded that defendant was a sleepwalker. He further testified that somnambulism or sleepwalking is a disassociative state wherein an individual performs motor acts without waking consciousness. He further stated that a sleepwalker could perform intricate maneuvers while asleep and could commit acts

of violence, although such occurrences were rare.

The defendant's first assignment in error urges that the misconduct of the juror, Marion Wright, and the witness, Kate Graham, prevented the defendant from obtaining a fair and impartial trial. The record indicates that Marion Wright was next to the last juror drawn to complete the panel that tried the defendant. Sometime prior thereto Kate Graham, who subsequently testified as a witness on behalf of the State, talked to Mr. Wright in the courtroom. Mr. Wright related the conversation as follows, to-wit:

"Q. What did he say to you there before he came in the courtroom?

"A. Well, she said he was on dope, and she told me to notice his eyes when he came in. Said he was— said they looked glassy or something to this effect, anyway. And I told her I was going to get excused for the next week. And she told me to try to stay if I could, and get him convicted."

"Q. Was there any statement made about a hammer?

"A. Oh, yes. She said that he had put the hammer there the night before, before her death.

"Q. Did she say where he had put it?

"A. I think she said under the pillow or under the bed. I'm not sure where she did say now.

"Q. And she made that statement to you whenever you were sitting there—before you had been called as a juror?

"A. Yes."

The record further reflects that Mr. Wright failed to divulge this information to the Court on voir dire examination and that defense counsel was unaware until after the trial. The defendant, having no reason to challenge Mr. Wright for cause, then exercised his last peremptory challenge against Wright and a new juror was drawn and qualified. Neither the record nor the brief indicates that defense counsel was forced to accept an incompetent juror or that he was forced to accept a juror he knew would be prejudiced towards the defendant. The record is silent as to the identity, qualifications or opinions of the last juror.

■ In the recent case of *Thompson v. State,* Okl.Cr., 519 P.2d 538, this Court held in a case similar to the one at hand that not only must there be error but there must also be injury. The burden is upon the defendant to establish he was prejudiced in his substantial rights. *Fennell v. State,* Okl.Cr., 396 P.2d 889. In *Thompson,* supra, the defendant had exercised all peremptory challenges and was precluded from removing a prospective juror from the panel whom he considered to be undesirable to his position. The dilemma was called to the attention of the trial court. We, therefore, held that there had been substantial injury and the case was reversed.

■ However, in the instant case, the record is silent and there is no contention that the defendant Sallee was precluded from removing a prospective juror whom he considered to be undesirable. The defendant's first proposition is without merit. See also *Ferrell v. State,* Okl.Cr., 475 P.2d 825.

Defendant's second assignment of error urges that the trial court erred in permitting Kate Graham to testify to statements allegedly made to her by the deceased outside of the defendant's presence. As set out above, the witness Kate Graham, a neighbor of the Sallees, testified as to certain statements made to her by Mrs. Sallee concerning her fear of the defendant and threats that he had made to kill the family "before the year was out". The record indicates that defense counsel made strenuous and timely objections to the admission of the hearsay evidence and that said objections were overruled by the trial court.

■ It is the defendant's contention that the testimony was hearsay and prejudicial, and materially contributed to the conviction of the defendant. There is no doubt that the testimony was hearsay. However, antecedent declarations of a decedent made outside the presence of the defendant are admissible in a homicide case for the purpose of showing the decedent's state of mind toward the defendant or to supply the motive for the killing. See *Lowrey v. State,* 87 Okl.Cr. 313, 197 P.2d 637 and *Dandridge v. State,* Okl.Cr., 519 P.2d 529. In *Lowrey,* supra, this Court stated that the object of the hearsay testimony of the decedent's father was to supply motive for the killing. In the instant case the testimony of Mrs. Graham was relevant to the issue of motive and gave an insight into the state of mind of the decedent. The evidence was, therefore, admissible for those specific and limited purposes.

Defendant's third assignment of error urges that the trial court committed reversible error in giving the limiting instruction required by *Lowrey,* supra, and *Dandridge,* supra. This instruction complained of is as follows:

"You are instructed that the Court has permitted evidence to be introduced concerning certain statements made by the deceased, outside the presence of the defendant, concerning her state of mind towards the defendant. Such evidence is proper for you to consider insofar as it may tend to shed light on the motives of the decedent or the defendant, and you are not to consider them for any other purpose."

■■ The instruction complained of requires that the jury consider the evidence only for the limited purposes stated. Such an instruction conforms to the requirements of *Lowrey,* and is not erroneous. It should also be noted that although defense counsel objected to the instruction he did not submit a requested instruction for the trial court's consideration. In *Schapansky v. State,* Okl.Cr., 478 P.2d 912, this Court held that where counsel is not satisfied with the instructions that are given, or desires the trial court to give any particular instruction, it is the duty of counsel to prepare and present to the trial court such desired instruction and requested that it be given. In the absence of such a requested instruction the Court of Criminal Appeals will not reverse the case if instructions generally cover the subject matter of the inquiry.

Therefore, for all the reasons set out above, it is our opinion that the defendant's second and third propositions are without merit.

■ The defendant's fourth assignment of error contends that the trial court erred in refusing to permit Dr. Shurley to give his opinion, based on his asserted scientific certainty of his profession, that the defendant was sleepwalking and was not conscious at the time the violent blows were made to the head of the deceased. We do not agree.

It is apparent from the testimony of Dr. Shurley that he was a qualified expert in the field of sleep research, sleepwalking, and the type and characteristics of somnambulistic or sleepwalking acts. The trial court was quite liberal in allowing Dr. Shurley to testify as to his opinion concerning whether the defendant was in fact a sleepwalker and whether such an act of violence could be committed by a person while not in the state of wakeful consciousness. However, the trial court properly refused to allow Dr. Shurley to give his opinion as to whether the defendant was sleepwalking at the time of the commission of the homicide.

In *Van Zandt v. Mutual Benefit Life Insurance Company,* 55 N.Y. 169, it was held to be error to admit medical testimony that the suicide or a person having melancholia was attributible to the melancholia, on the ground that the question calls for no information peculiarly within the knowledge of an expert, but for an inference which was within the province of the jury to draw, without being influenced by the opinion of the witness.

In *Bearshield v. State,* Okl.Cr., 318 P.2d 462, in paragraph two of the Syllabus it is stated that expert testimony is not admissible upon questions which the court or jury can decide upon the facts, when the relation of facts and their practical results can be determined without special skill or study.

In the instant case Dr. Shurley testified from his own observation, skill and study that the defendant was a sleepwalker and that a sleepwalker could perform intricate motor acts and commit acts of violence. However, to allow the expert to offer his opinion concerning whether the defendant was sleepwalking on the night in question invades the province of the jury. The defendant's fourth proposition is without merit.

■ The defendant's fifth assignment of error argues that the prosecuting attorney made several improper statements in his closing argument. One of the arguments complained of alluded to the devious mind of defense counsel in preparing a defense based upon the unconscious acts of a sleepwalker. An objection was made and sustained. Defense counsel did not request that the jury be admonished to disregard the statement. Counsel, therefore, did not properly preserve the error and it cannot be considered on appeal. *Weekly v. State,* Okl.Cr., 509 P.2d 482.

■ The other portion of the prosecutor's argument complained of concerns the following remark, to-wit:

"I think, Ladies and Gentlemen, that you have a duty to see to it that he gets what he needs. And you have two choices. You can either find him Guilty and accomplish the ends of justice, or you and I can give him back his hammer, and you and I and he can walk out of this courtroom together this afternoon, and he can be free to go back to Alice and Robin and sleep with them to-

night, remarry someone else, and the future is in your hands. Ladies and Gentlemen. Thank you."

Again the defendant objected but failed to request that the trial court admonish the jury to disregard the statement. Under the fact situation arising out of the instant case, it is our opinion that the above statement does not constitute error. It is supported by the evidence of the threats of the defendant to kill the family "before the year is out."

■ It should also be noted that if either of the above statements complained of constituted error it is impossible for this Court to determine from the record whether the error was prejudicial. The record contains only the last portion of the prosecutor's closing argument. It is, therefore, impossible to determine if the statements were invited by defense counsel's closing argument. See *Weekly,* supra; *Needham v. State,* 55 Okl.Cr. 430, 32 P.2d 92; and *Graham v. State,* 80 Okl.Cr. 159, 157 P.2d 758. The defendant's fifth proposition is without merit.

■ The defendant's last assignment of error contends that the verdict and judgment were contrary to both the law and the evidence. Again we disagree.

■ A thorough reading of the transcript of the testimony satisfies us that there was sufficient, though conflicting, evidence to support the verdict of guilty in the instant case. Whether the defendant was or was not in a conscious state of wakefulness at the time of the commission of the homicide is a question of fact for the jury. The jury was properly instructed on the law, the defendant received a fair and impartial trial and no substantial right was prejudiced. The judgment and sentence appealed from should be and the same is hereby *affirmed.*

BRETT, P. J., and BUSSEY, J., concur.