Ronald Keith **WILLIAMSON,** Appellant,

v.

**STATE of Oklahoma,** Appellee.

No. F–88–501.

Court of Criminal Appeals of Oklahoma.

May 15, 1991.

Rehearing Denied Sept. 9, 1991.

William H. Luker, Asst. Appellate Public Defender, Norman, for appellant.

Robert H. Henry, Atty. Gen., David Walling, Asst. Atty. Gen., Oklahoma City, for appellee.

## OPINION

LUMPKIN, Vice–Presiding Judge:

Appellant Ronald Keith Williamson was tried by jury and convicted of Murder in the First Degree (21 O.S.1981, § 701.7), in Case No. CRF–87–90, in the District Court of Pontotoc County. The jury found the existence of three aggravating circumstances and recommended punishment of death. The trial court sentenced accordingly. From this judgment and sentence Appellant has perfected this appeal.

On December 8, 1982, twenty-one (21) year old Debbie Carter was found dead in her garage apartment in Ada, Oklahoma. She was discovered by her father, who had come to check on her at her mother's request, fearing that something might be wrong. Walking up the stairs to the second floor apartment, Mr. Carter observed glass covering the landing and the screen door and front door standing wide open. Walking through to the bedroom, he found Debbie's body laying face down on the floor with a washcloth stuck in her mouth. The police were called and the investigation into the murder began.

Detective Dennis Smith, Ada Police Department, was among the first to arrive at the scene. He testified at trial that the apartment showed signs of a struggle. Broken glass was found on both the inside and outside of the front door. In the living room, the sofa cushions and a nightgown were on the floor. On the wall, written in what was later determined to be fingernail polish, were the words "Jim Smith next will die". On top of the kitchen table was written "don't look fore us or ealse" [sic]. Approaching the bedroom, he saw the bed blocking the entry into the room. The room was in complete disarray with clothing, sheets, blankets and stuffed animals on the floor. Debbie Carter's body, nude except for a pair of white socks, was on the·

floor between the bed and the wall. Written on her back in catsup were the words "Duke Graham". Written on her chest in fingernail polish was the word "die". A blood soaked washcloth was stuffed into her mouth and down her throat. Underneath the body was an electric cord and a belt. The bathroom, connected to the bedroom, showed no signs of a disturbance. Detective Smith stated that he immediately began to fingerprint the scene.

Detective Smith further testified that on March 14, 1983, he interviewed the Appellant at his mother's home. When shown a photograph of the decedent, Appellant stated that he thought he knew her but he was not sure. His mother said that she was sure Appellant had nothing to do with the murder as he was home that night by 10:00 p.m. The Appellant was asked for hair and saliva samples. He cooperated, voluntarily appearing at the police station to comply with the request.

Fred Jordan of the Medical Examiner's Office testified that he performed the autopsy on the decedent on December 9, 1982. He stated that numerous bruises were found on the decedent's face, arms and body, several of which were defensive wounds. Small puncture wounds were also discovered on her nose and cheeks. The inside of her lips and mouth were cut and a semi-circular ligature mark was found on her neck. An internal examination revealed internal bruising and a small metal bottle cap inside her rectum. Dr. Jordan testified that the cause of death was suffocation as a result of the washcloth in her mouth and the ligature tightened around her neck.

Mary Long, forensic chemist with the Oklahoma State Bureau of Investigation (OSBI), testified in detail concerning the procedures and results of her analysis of body fluids. She stated that she had received samples of body fluids from approximately twenty (20) subjects, including Appellant and Dennis Fritz,[1] and other items of evidence to test. Her conclusions in relevant part showed that: (1) Debbie Carter was blood type A; (2) Appellant was blood type O and a non-secretor; (3) Dennis Fritz was blood type O and a non-secretor; (4) the sheets from the decedent's bed contained semen and human blood, type A, but no antigen activity was found indicating that the donor could have been a non-secretor; (5) vaginal swabs yielded no antigen activity.

Melvin Hett, forensic chemist with OSBI, also testified in detail to procedures and results in his analysis of hair and fibers retrieved from the crime scene. His results showed: (1) two (2) hairs found on the washcloth were microscopically consistent with scalp hairs from Appellant; (2) two (2) hairs found on the decedent's bedding were microscopically consistent with pubic hairs from the Appellant; (3) two (2) hairs found on the decedent's underwear were microscopically consistent with pubic hairs from Dennis Fritz; (4) seven (7) hairs found on the bedding were microscopically consistent with pubic hairs from Dennis Fritz; (5) two (2) hairs found on the washcloth were microscopically consistent with scalp hairs from Dennis Fritz.

Jerry Peters, crime scene specialist with OSBI, testified that he conducted a fingerprint analysis on a blood stained piece of sheetrock removed from the south wall of the decedent's bedroom. He was unable to match the prints discovered in the blood stain to the Appellant, Dennis Fritz or the decedent. The body of Debbie Carter was exhumed in May 1987, and a new set of prints were taken. The print found on the blood stained wall matched the prints of the decedent.

Gina Vietta testified that she and the decedent worked at the Coachlight Club and that the Appellant and Dennis Fritz frequented the club. Ms. Vietta testified to a conversation with the decedent approximately two weeks before the murder in which the decedent had stated that she felt uncomfortable around the Appellant. Ms. Vietta stated that she received a phone call

---

1. Dennis Fritz was also charged with the murder of Debbie Carter. He was tried separately, convicted, and received life imprisonment.

from the decedent at approximately 1:30 a.m. on December 8, 1982, asking her to come to her apartment and pick her up. She said that someone was there and she did not feel comfortable. Ms. Vietta told the decedent that she would come get her; however, a couple of minutes later, the decedent called back and told Ms. Vietta that she "didn't need to bother to come over and pick her up. She had decided to stay there." (Tr. 357) The decedent would not tell Ms. Vietta who was there but asked her to call her in the morning to wake her up for work. That morning, Ms. Vietta was late for work and did not call the decedent until later. When she did, all she could hear over the phone were muffled sounds as if someone had put their hand over the receiver.

The preliminary hearing testimony of Glen Gore, declared to be unavailable to testify at trial, was read to the jury. Mr. Gore testified that he saw both the decedent and the Appellant at the Coachlight Club during the early morning hours of December 8, 1982. When he went up to the bar to get a drink, Debbie Carter asked him if he would "rescue" her. She told him the Appellant was "bugging" her. (Tr. 331) Later, around closing time, when the lights were being turned on, Gore saw the Appellant talking to the decedent.

Donna Walker worked at Love's Country Store and testified that she saw both Appellant and Dennis Fritz in the store often. They were regular customers until December 8, 1982. After that date, they disappeared for several weeks. Upon their return both men had changed drastically in appearance and personality. They appeared unkept and unshaven, wore dirty clothes, and acted belligerent, nervous and paranoid.

Terri Holland was an inmate of the Pontotoc County jail from October 1984, until January 1985. She testified that she had overheard the Appellant, who was periodically in jail during that time, talk about the murder of Debbie Carter. Ms. Holland stated that she overheard Appellant remark to other prisoners that if Debbie Carter had cooperated with him he would never had to kill her. Appellant described the crime stating that "he shoved a coke bottle up her ass and her panties down her throat." (Tr. 575) On another occasion, Ms. Holland overheard a telephone conversation between Appellant and his mother wherein Appellant threatened his mother, telling her if she did not do as he said that he would have to kill her like he did Debbie Carter.

OSBI Agent Gary Rogers testified that he assisted the Ada Police Department in the criminal investigation. He testified that arrest warrants were issued for the Appellant and Dennis Fritz approximately four days after the bloody palm print discovered on the wall was matched to the decedent.

Agent Rogers stated that he interviewed the Appellant on May 9, 1987. After reading the Appellant the *Miranda* warning and receiving a waiver of his rights, Rogers questioned Appellant about the Carter homicide. Appellant told Rogers that he was at the Coachlight Club on December 8, 1982, when he saw a pretty girl and decided to follow her home. Rogers stated that Appellant started to continue his tale but then just stopped and paused for a few minutes. He resumed the conversation talking about another topic, but Agent Rogers brought him back to the subject of the homicide. Appellant said he had a dream about killing Debbie Carter. In the dream he was on top of her, with a cord around her neck, stabbed her repeatedly, and pulled the rope tight around her neck. Appellant paused and then stated that he was worried about what this would do to his family. After another long pause, Appellant said that Dennis Fritz was there with him, and that he went to the apartment with the intention of killing the decedent because she had made him mad. Appellant then looked to the floor and said "oh my god, ... you cannot expect me to confess." .... "I've got my family; I've got a nephew to protect, my mother and sister.... it'll tear them up—or my sister, it'll tear them up.... it can't hurt my mother, .. she's dead, you know, it's been on my mind since it happened." (Tr. 450)

Appellant then requested an attorney and the interview ceased.

Mike Tenney, an employee in the county jail, testified that Appellant made several remarks to him about Debbie Carter and the murder. Mr. Tenney testified that Appellant told him that just because he argued with Debbie Carter did not mean that he killed her. Later, Appellant commented that "nobody saw [him] sneaking up the stairs to [her] apartment and knock the front door open." Appellant then remarked "I shouldn't have said that; I'm going to be quiet now", and he started to sing. (Tr. 601)

John Christian, Pontotoc County Sheriff's Department, testified that he was working in the jail on May 22, 1987, when the Appellant struck up a conversation with him. Appellant told Christian that he had a dream wherein he was living in Tulsa and had been taking drugs and drinking beer all day. He drove to Ada to the Coachlight Club and met Debbie Carter. "Later that night, went to her house, knocked on her door, and she said just a minute, I'm on the phone. And then, he stated that he broke the door in, and raped and killed her." (Tr. 619)

Cindy McIntosh was an inmate in the Pontotoc County Jail in July 1987. She testified that both Appellant and Dennis Fritz left at the same time to go to their preliminary hearings. Appellant was returned to his cell first and then later Dennis Fritz. McIntosh testified that she overheard Fritz tell Appellant that he had seen the pictures of Debbie Carter. Appellant asked Fritz if "she was still on the floor or was she on the bed". (Tr. 596)

Appellant presented eight (8) witnesses in his defense. Seven (7) of the witnesses were employees of the Pontotoc County jail who testified that they had never heard the Appellant make any statements about the murder of Debbie Carter. Appellant was the final witness. He denied killing Debbie Carter. He testified that he did not remember her and had never been to her apartment. He stated that he was at home with his mother the night of the murder and first heard about the crime from his

sister. He denied all conversations about the murder except for one with Agent Rogers when he said he had a dream about the murder. However, he said that Rogers misunderstood what he had told him and that he had actually said that in his dream he was acting as an investigator. On cross-examination, Appellant admitted to prior felony convictions for escape and driving under the influence of intoxicating liquor. Appellant also stated that he had been friends with Dennis Fritz since 1981.

During the second stage, the State incorporated all first stage evidence. The State then presented the testimony of four women who described violent and threatening acts by the Appellant. The testimony is detailed in the section concerning alleged errors during second stage. Appellant did not present any evidence in the second stage.

## I. PRE-TRIAL ISSUES

In his seventh assignment of error, Appellant contends that the delay in bringing his case to trial violated his rights to due process and a speedy trial under both the United States Constitution and the Constitution of the State of Oklahoma. Debbie Carter was murdered on December 8, 1982. Felony charges of First Degree Murder were filed against Appellant and co-defendant Dennis Fritz on May 8, 1987. On December 14, 1987, Appellant filed a pretrial motion to dismiss for lack of speedy trial. The motion was overruled and Appellant's trial was commenced on April 21, 1988.

The Sixth Amendment right to a speedy trial does not apply prior to the time that a defendant becomes an accused. *United States v. Marion*, 404 U.S. 307, 313, 92 S.Ct. 455, 459, 30 L.Ed.2d 468 (1971); *Cooper v. State*, 671 P.2d 1168, 1175 (Okl.Cr.1983); *McFatridge v. State*, 632 P.2d 1226, 1231 (Okl.Cr.1981). The protection of the Sixth Amendment is activated only when a criminal prosecution has begun and extends only to those persons who have been accused in the course of that prosecution. *Marion*, 404 U.S. at 314,

92 S.Ct. at 459. The Sixth Amendment has not been extended to the period prior to arrest. *Id.,* 404 U.S. at 322, 92 S.Ct. at 463–464.

■ Appellant became the accused when the felony information was filed. Therefore, the five year time lapse between the offense and the filing of the charge did not violate Appellant's right to a speedy trial.

■ In *Marion* the Supreme Court noted that the Due Process Clause of the Fifth Amendment could require dismissal of the criminal charges if it were shown that the pre-indictment delay in the case caused substantial prejudice to the defendant. *Id.,* 404 U.S. at 325, 92 S.Ct. at 465. This was expanded upon in *United States v. Lovasco,* 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977), with the Supreme Court stating that a due process inquiry must consider the reasons for the delay as well as the prejudice to the accused. While leaving to the lower courts the application of the settled principles of due process, the Supreme Court determined that to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time. *Id.,* 431 U.S. at 796, 97 S.Ct. at 2052.

Appellant argues that the reason for the delay in the present case was the negligence of the State in processing certain items of evidence, specifically a palm print. He alleges prejudice by the delay as his only alibi witness, his mother, died in 1985.

This Court addressed the possible prejudice to the defendant by the death of a witness in *Johnson v. State,* 761 P.2d 484, 488 (Okl.Cr.1988). We stated that for purposes of determining whether a defendant was denied his right to a speedy trial because of a delay between the filing of the criminal charges and trial, the death of a witness is an obvious prejudice. If a defendant raises the presumption of prejudice, the burden is on the State to rebut. If the State fails to disprove the prejudice, the presumption must stand. However, we stated further that bald assertions of prejudice, unsupported by either the record or affidavits as to what the deceased witness might have testified to, fail to raise any presumption of prejudice. Although the delay in *Johnson* was that of a speedy trial after the filing of criminal charges, the principles are helpful in the due process analysis required in examining an investigatory delay. The only record of what Appellant's mother would have testified to is in the trial transcript. During the testimony of Detective Dennis Smith, the State brought out that Appellant's mother had been interviewed in her home on March 14, 1983, and had told the Detective that Appellant was home by 10:00 p.m. the night of the murder. (Tr. 394–395)

On cross-examination, Detective Smith again testified that Mrs. Williamson said she knew that Appellant did not commit the murder because he was home at 10:00 p.m. (Tr. 430) Appellant also testified that his mother knew he was home the night of the murder. (Tr. 430–431) The State did not object to either of these hearsay statements. Appellant now argues that "hearsay testimony is no substitute for a living witness who could have faced the jury." (Appellant's Brief pg. 53)

Although it may have been more desirable for Appellant to have his mother actually take the witness stand and testify before the jury, we do not find that he suffered any prejudice by the inability to so present her. The jury heard the testimony of Mrs. Williamson on three separate occasions. This testimony was put before the jury without being subjected to the rigors of cross-examination. Further, Appellant does not allege that if his mother had been able to personally testify that her statements would have been any different or that she would add any information to that previously provided. We would also note and refer to our discussion below, that the State did not have sufficient evidence to charge Appellant with the murder until 1986, at the very earliest, after the death of Appellant's mother. Therefore, under these circumstances, we find that Appellant was not prejudiced in his rights to a fair trial by the death of his mother.

The determination that Appellant was not prejudiced by the delay does not end

our inquiry. We must next look into the reasons for the delay in filing the criminal charges. By December, 1985, the State's evidence showed that hairs from the Appellant were microscopically consistent with hair found on the decedent's body and on her bed. (O.R. 69–75) The result of blood and saliva tests showed that the Appellant and the decedent's assailant were non-secreters. (O.R. 98–101) While this evidence might corroborate other evidence of guilt, standing alone, it was insufficient to warrant a charge of first degree murder.

In February, 1986, Terri Holland informed the District Attorney of admissions made by Appellant while in the Pontotoc County jail. A latent palm print had been discovered in blood splattered on the south wall of the decedent's bedroom. That portion of the wall was removed and sent to the OSBI for analysis. The print did not match those of the Appellant, Fritz, or the decedent. Believing that the identity of the print could be important, prosecutors decided to wait until the print could be identified before filing criminal charges. Fingerprints of Debbie Carter had been taken at the time of the autopsy, however, a good print of her palm had not been obtained. The decedent's body was subsequently exhumed in May, 1987, and a new palm print was taken. This print matched the bloody print on the wall. Arrest warrants for the Appellant and co-defendant Fritz were issued approximately four (4) days later.

Under these circumstances, we do not find that Appellant was denied due process of law by the delay. The delay was caused by a need for proof of Appellant's guilt. Although no further physical evidence was taken from possible subjects and submitted for analysis after 1983, Agent Rogers testified that he continued the investigation by conducting numerous interviews with those having any knowledge of the crime. The information provided by Ms. Holland, which corroborated the physical evidence, did not come to the State's attention until 1986. Even then, the State was not obligated to halt the criminal investigation the moment they had the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction. See Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), as quoted in United States v. Marion, 404 U.S. at 235 n. 18, 92 S.Ct. at 465 n. 18.

The delay in the present case was not a "tactical" delay designed to impair the ability of the Appellant to mount an effective defense. Indeed as the Supreme Court stated in Lovasco, "an investigative delay is fundamentally unlike delay undertaken by the Government solely to gain tactical advantage over the accused." 431 U.S. at 796, 97 S.Ct. at 2051. Here, the prosecutor acted properly in refusing to file a criminal charge of murder until he was completely satisfied that he could prosecute and that he would be able to establish guilt beyond a reasonable doubt. After full consideration of the reasons for the delay and the prejudice to the Appellant, we find that the pre-accusation delay did not deny Appellant due process of law. Therefore, this assignment of error is denied.

■ In the eleventh assignment of error, Appellant alleges that he was denied due process of law by the trial court's failure to grant his pre-trial motion for State funded expert witnesses in hair comparison and serology. The record reflects that in a pre-trial motion hearing, Appellant adopted all the motions filed by co-defendant Fritz, which included a request for experts knowledgeable in hair comparison and examination of saliva, semen and blood typing. (M.Tr. Sept. 8, 1987) No explanation or argument supporting the request was made to the court.

Appellant now relies on Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), to support his argument that due process is denied when access to an expert witness necessary for the defense is not provided. However, Ake has not been extended to include expert assistance other than a psychiatrist. Munson v. State, 758 P.2d 324, 330 (Okl.Cr.1988).

In Rojem v. State, 753 P.2d 359 (Okl.Cr. 1988), the defendant similarly relied on Ake

to argue error in the denial of funds for several experts including a criminologist and chemist. In rejecting the defendant's claim we found that the request for funds had been properly denied because:

First, the mere undeveloped assertions that the services of these experts are needed is not sufficient to qualify for funds. *Caldwell v. Mississippi,* 472 U.S. 320, 323–24, n. 1, 105 S.Ct. 2633, 2637 n. 1, 86 L.Ed.2d 231, 236 n. 1 (1986). Second, this Court has previously held that scientific evidence is ordinarily not vulnerable to inaccurate resolution and in itself does not ordinarily call for a defense expert. *Plunkett v. State,* 719 P.2d 834 (Okl.Cr.), *cert. denied* 479 U.S. 1019, 107 S.Ct. 675, 93 L.Ed.2d 725 (1986). There, as here, defense counsel cross-examined the experts called by the State and was able to elicit the limitations of the tests and examination performed. Due process was not endangered by the absence of a second set of experts. 753 P.2d at 364.

The request for funds was properly denied in the instant case. Appellant failed to meet his burden of establishing the need for the experts by neglecting to explain the undeveloped assertions contained in his motion. Further, Appellant was not prejudiced by the absence of his own experts as he not only had the opportunity to cross-examine the experts called by the State, but he took full advantage of that opportunity by thoroughly inquiring into details of the tests performed and eliciting testimony which illustrated the limitations of those tests. Accordingly, Appellant was not denied due process of law and this assignment of error is without merit.

## II. GUILT–INNOCENCE ISSUES

■ In his first assignment of error, Appellant contends that the evidence was insufficient to sustain a conviction for first degree murder. Appellant relies on *Opper v. United States,* 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101 (1954), and argues that as his admissions were neither corroborated nor consistent with the physical evidence, the evidence was insufficient to return a verdict of guilt.

In *Jones v. State,* 555 P.2d 63, 67–69 (Okl.Cr.1976), we adopted the rule stated in *Opper* that corroborative evidence need not be sufficient, independent of the defendant's statements, to establish the *corpus delicti.* It is necessary for the prosecution to introduce substantial independent evidence which would tend to establish the trustworthiness of the defendant's statement. In formulating our own rule we decided that once substantial evidence of the *corpus delicti* is introduced, the confession of the defendant is admissible, provided together they furnish the basis for a finding of the *corpus delicti* and the guilt of the defendant, both beyond a reasonable doubt. This standard was applied in *Stout v. State,* 693 P.2d 617, 622 (Okl.Cr.1984), a capital case, wherein we found that the existence of the crime and the defendant's guilt both were proved beyond a reasonable doubt by the evidence in conjunction with the extrajudicial admissions; thus the admissions were properly admitted at trial.

In the present case, the Appellant made certain admissions, in addition to a confession, which were corroborated by the extrinsic evidence. We find that substantial evidence of the homicide *corpus delicti* and the Appellant's guilt were established to properly admit the admissions and the confession.

The statement to John Christian, although related in the form of a dream, was corroborated by testimony of other witnesses which showed that Appellant knew the decedent and by evidence which showed that entry to the apartment the night of the murder had been made by breaking down the front door, and that the decedent had made two phone calls that night. The statement overheard by Cindy McIntosh was corroborated by evidence that the decedent was found on the floor and that a struggle had taken place in the bedroom. The statements to Mike Tenney were also corroborated by evidence that Appellant knew the decedent, that a struggle had occurred that night and that the decedent lived in a second floor apartment.

Appellant stopped just short of confessing to the crime in his statement to Agent Rogers. In part of the statement, Appellant said he had a dream about killing the decedent, where he stabbed her and pulled the rope tight around her neck. Without describing it as a dream, Appellant also stated that he was at the Coachlight Club on December 8, 1982, when he saw a pretty girl and decided to follow her home, and admitted that Dennis Fritz was with him that night. When asked if he went to the decedent's apartment with the intention of killing her, Appellant replied "probably". When asked the reason why, he stated "she made me mad". (Tr. 450) This statement was corroborated by the testimony of the medical examiner that the decedent suffered ligature marks on her neck and that her death was caused in part by strangulation.

Appellant's confession was introduced through the testimony of Terri Holland. Ms. Holland testified that Appellant stated that he met the decedent at a bar, that "he tried to go with Debbie Carter, and she wouldn't have nothing to do with him. And he said that if she would just went ahead and went with him, he'd never had to kill her." (Tr. 574) Ms. Holland also testified that she overheard Appellant say "he shoved a coke bottle up her ass and her panties down her throat". (Tr. 575) Ms. Holland further explained that she was not sure if Appellant had said he used a coke bottle or a catsup bottle since it had been four years since she had heard the statement. (Tr. 576)

Appellant argues that the statement was not sufficiently corroborated because of the factual errors and omissions. Specifically, these errors and omissions are that the decedent had a washcloth in her mouth and not her panties, and that a lid to a catsup bottle and not a coke bottle was discovered inside her rectum, and that no mention was made of the ligature, the writing on the wall or the presence of another person.

In *Opper*, the United States Supreme Court stated that it was "sufficient if the corroboration supports the essential facts admitted sufficiently to justify a jury inference of their truth." 348 U.S. at 93, 75 S.Ct. at 164. Here, the essential facts were corroborated despite the inconsistency in the type of gag and the type of bottle cap. A cloth object was found stuffed in the decedent's mouth and a small metal bottle cap was discovered in her rectum. Hair evidence placed Appellant at the decedent's apartment and Appellant's blood type was shown to be consistent with that of the decedent's assailant. Appellant was shown to have frequented the Coachlight Club and come into contact with the decedent. The decedent was killed at her home, a second floor apartment and she was strangled with a cord. Many of these facts were details of the offense which had not been released to the press and were not known to the general public.

Based upon the foregoing, we find that substantial independent evidence was presented which directly established both the *corpus delicti* and the truthfulness of Appellant's admissions and confession. The evidence of Appellant's presence at the decedent's apartment the night of the murder and his relationship with her constitutes corroboration of his extrajudicial admissions. The jury was free therefore to consider the admission and confession in connection with all the other evidence in the case and to decide whether the guilt of the Appellant had been established beyond a reasonable doubt. They found that it was and we feel that such finding is supported by substantial evidence. *Opper*, 348 U.S. at 94, 75 S.Ct. at 165. Accordingly, this assignment of error is denied.

■ Appellant contends in the third assignment of error that the trial court erred in admitting the hair evidence obtained from the washcloth and the bedding as an adequate chain of custody had not been established.

■ The purpose of the chain of custody rule is to guard against substitution of or tampering with the evidence between the time it is found and the time it is analyzed. The State must lay a foundation showing that the evidence offered is in substantially the same condition as when

the crime was committed. *Driskell v. State*, 659 P.2d 343, 354 (Okl.Cr.1983). *See also Middaugh v. State*, 767 P.2d 432, 436 (Okl.Cr.1988). To have evidentiary value the article must be preserved in its original condition and protected against contamination. *Driskell*, 659 P.2d at 354. However, it is not necessary that all possibility of alteration be negated, and any doubt as to the circumstances surrounding the preservation of the evidence goes to the weight of such evidence rather than its admissability. *Fixico v. State*, 735 P.2d 580, 582 (Okl.Cr. 1987).

Addressing first the hair evidence gathered from the bedding, the record reflects that Agent Rogers, Detectives Dennis Smith and Mike Kiesewetter gathered the hair evidence from the crime scene. The hairs were placed in individual envelopes or paper bindles and marked with the exact location where they were found, the date of collection and the name of the officer who discovered the evidence. The decedent's bedding—two sheets, a pillow case and bedspread were also gathered up and put in a box. Attached to the bedspread was a tag which described the item, the date the item was collected and Detective Smith's name. The same items of authentification were placed on the sheets and pillow case.

A few days later, evidence collected at the scene, including the box containing the bedding, was transported to the OSBI office in Oklahoma City by Agent Rogers and Detective Smith. OSBI Criminalist Mary Long received the evidence and searched the bedding for traces of hair evidence. She recovered numerous hairs from the bedding. Hairs removed from the different items of bedding were placed in separate containers. These containers were transferred to Criminalist Susan Land on January 17, 1983, for analysis.

Ms. Land mounted the individual hairs on microscopic slides. These slides were then turned over to OSBI Criminalist Melvin Hett on September 19, 1983. Each slide was assigned an item number for identification purposes. Hett analyzed the hair and compared it to known samples from the Appellant.

Appellant challenges the chain of custody for numerous reasons. Initially, he argues that the record does not reflect exactly which officer recovered the bedding at the scene. Based upon the procedure previously described, and as testified to by Detective Smith at trial, the evidence supports the conclusion that he collected the bedding. Appellant correctly notes that there is a gap in time from the date of the collection of the bedding from the scene until it was turned over to Mary Long. The record does not clearly state when Ms. Long received this evidence, but she did receive numerous other items of evidence from Agent Rogers on December 16, 1982. Although the bedding was not specifically accounted for during the time period, the record supports an inference that it remained with the Ada Police Department. This does not render the evidence inadmissible as Appellant has failed to show that the evidence was not in the same condition as when it was collected or that there was the possibility of alteration. The bedding remained in the box and there is no evidence that the bedding was ever removed from the box before it reached Ms. Long. Further, any doubt as to its preservation until it reached the OSBI goes to the weight of the evidence, not its admissibility. *See Minter v. State*, 756 P.2d 10, 11 (Okl.Cr.1988).

Turning to the washcloth discovered in the decedent's mouth, the State adequately showed that the evidence was preserved under circumstances reasonably certain to maintain its integrity. This showing was made through the testimony of the Medical Examiner, who initially removed the washcloth during the autopsy, and the subsequent testimony of Criminalists Long, Land and Hett. Hett specifically stated that Item No. 17, hairs from the washcloth, were received from Susan Land and were microscopically consistent with hairs from the Appellant.

Appellant further contends that no precautions were taken to prevent contamination of the washcloth before it reached the medical examiner. Although the record does not directly address this issue, it does

reflect that the body was taken from the scene to the funeral home. There it was placed in cold storage until it was transferred to the medical examiner during the early evening of December 8, 1982. The body was again kept in cold storage until the autopsy the next day. The record does not support any allegations that the body may have come into contact with any other fibers or hair that might have altered scientific test results. Assuming arguendo support for such allegations existed, the allegations would go solely to the weight of the evidence and not its admissibility.

Appellant further argues that the hair evidence was inadmissible, as Melvin Hett never identified the specific hairs he found consistent with the Appellant's hair or the individual slides on which the hairs were located. The record reflects that Hett testified to receiving the microscopic slides of hair evidence from Land and that his analysis of those slides revealed two (2) hairs microscopically consistent with pubic hairs of the Appellant.

Although the testimony could have been better developed, there is no evidence to show that the hair evidence was altered or that there was any tampering. The State adequately showed that hairs found to be consistent with those from the Appellant were taken from the washcloth and the bedding. The possibility of multiple samples of hair on the evidence is not such that it would alter the result of the hair analysis since the essence of such tests is identification by comparison and distinguishing various sources. *See Devooght v. State,* 722 P.2d 705, 713 (Okl.Cr.1986). Therefore, we find that a sufficient chain of custody was established and the trial court did not abuse its discretion in admitting the hair evidence.

In his fifth assignment of error, Appellant contends that the trial court erred in failing to give an instruction on First Degree Manslaughter. At trial, Appellant took the stand and testified that he had nothing to do with the murder. In *Spuehler v. State,* 709 P.2d 202, 204 (Okl.Cr.1985), we reiterated the well established rule that when a defendant, who has a right of election as to several defenses, takes the stand as a witness and makes such admissions as to render every theory of defense unavailable save one, he will be deemed to have elected that one. *Newby v. State,* 17 Okl.Cr. 291, 188 P. 124, 129 (1920), citing *Sayers v. State,* 10 Okl.Cr. 233, 135 P. 1073, 1078 (1913). *See also Seegars v. State,* 655 P.2d 563, 565 (Okl.Cr. 1983). Appellant acknowledges this rule but urges this Court to abandon it in capital cases, arguing that *Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), requires the trial court to instruct on lesser included offenses when the evidence would support such a verdict.

In *Beck,* the Supreme Court recognized the risk of an unwarranted conviction that is created when the jury is deprived of the option of convicting the defendant of a lesser included offense. The Court concluded that such a risk cannot be tolerated in a capital case. In *Spaziano v. Florida,* 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984), the Court refused to extend *Beck* to cases where the lesser included offense was barred by the statute of limitations. The Court stated that *"Beck* does not require that the jury be tricked into believing that it has a choice of crimes for which to find the defendant guilty, if in reality there is no choice." 468 U.S. at 457, 104 S.Ct. at 3160.

Title 22 O.S.Supp.1989, § 152, prohibits prosecution for first degree manslaughter commenced more than three years after the commission of the offense. Here, Appellant was charged five years after the death of Debbie Carter. Therefore, not only did the evidence solely support the primary charge, but pursuant to the dictates of *Spaziano,* Appellant was not entitled to an instruction on first degree manslaughter as it was an offense for which the jury could not find him guilty.

In his sixth assignment of error, Appellant alleges error in the admission of photographic evidence. Appellant argues that the photographs were not relevant, as there was no dispute concerning the cause of death and that he was prejudiced by the repetitive nature of the photographs.

It is well settled that the admissibility of photographs is a matter within the trial court's discretion. Absent an abuse of that discretion, this Court will not reverse the trial court's ruling. *Nuckols v. State*, 690 P.2d 463, 470 (Okl.Cr.1984), *cert. denied*, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985). For photographs to be admissible, their content must be relevant and their probative value must substantially outweigh their prejudicial effect. *Smith v. State*, 737 P.2d 1206, 1210 (Okl.Cr.), *cert. denied*, 484 U.S. 959, 108 S.Ct. 358, 98 L.Ed.2d 383 (1987); *Oxendine v. State*, 335 P.2d 940, 942 (Okl.Cr.1958).

The fact that the pictures are gruesome does not of itself cause the photographs to be inadmissible. The probative value of photographs of murder victims can be manifested numerous ways, including showing the nature, extent, and location of wounds, depicting the crime scene, and corroborating the medical examiner's testimony. *Moore v. State*, 736 P.2d 161, 164 (Okl.Cr.), *cert. denied*, 484 U.S. 873, 108 S.Ct. 212, 98 L.Ed.2d 163 (1987); *Thompson v. State*, 724 P.2d 780, 782 (Okl. Cr.1986), *judgment vacated, case remanded on other grounds* 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988); *Robison v. State*, 677 P.2d 1080, 1087 (Okl.Cr. 1984), *cert. denied*, 467 U.S. 1246, 104 S.Ct. 3524, 82 L.Ed.2d 831 (1984). Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice or needless presentation of cumulative evidence. *See* 12 O.S. 1981, § 2403.

Appellant's argument that the photos are not relevant if the cause of death is not contested was addressed and rejected in *Nguyen v. State*, 769 P.2d 167 (Okl.Cr. 1988), *cert. denied*, 492 U.S. 925, 109 S.Ct. 3264, 106 L.Ed.2d 609, *reh. denied*, 492 U.S. 938, 110 S.Ct. 27, 106 L.Ed.2d 639 (1989). Relying on *Newbury v. State*, 695 P.2d 531, 534 (Okl.Cr.1985), we stated that in every criminal prosecution, it devolves upon the State to prove, first, the *corpus delicti*, and second, that the crime was committed by the accused. Pictures of the murder victim are always probative in es-

tablishing the *corpus delicti* of the crime. *Id.* at 171.

In the present case, twelve (12) 5 × 7 black and white photographs of the crime scene and the victim as discovered at the scene were introduced. Appellant objected to four of these photos on the basis that they had no probative value. (Tr. 376–377) We disagree with Appellant and find the photographs are probative of the crime scene and the victim as they were discovered by law enforcement officers. Three of the four photographs objected to by the Appellant are pictures of the decedent's bedroom taken from different angles, with the decedent's body visible in increasing degrees. Despite some repetition, we do not find an abuse of discretion in admitting them into evidence. *Cf. President v. State*, 602 P.2d 222, 226 (Okl.Cr.1979).

Ten (10) 3 × 5 color polaroid photos taken by the medical examiner of the victim were also introduced at trial. The Appellant objected to the admission of each of the photos on the grounds that they were not relevant. (Tr. 539) These particular photographs were taken by the medical examiner at the beginning of the autopsy. Each photograph illustrates a different area of the victim's body and the marks and wounds thereon. As the photos corroborate the medical examiner's testimony and illustrate the wounds received by the victim, we find their probative value outweighs any prejudicial effect.

Also introduced were six (6) 5 × 7 color photographs of isolated areas of the victim's body showing the body's reaction to a chemical designed to reveal latent fingerprints. Appellant objected to four (4) of the photos as having no probative value and as being repetitive. (Tr. 628) At trial, Appellant repeatedly attacked and belittled the criminal investigation and the procedures used. These six (6) photographs illustrate the attempt of the law enforcement officers to search for latent fingerprints on the victim's body. Although no prints were discovered, these photographs represent the State's repeated endeavors to solve the homicide. As such, they rebut the Appellant's theory of a lackluster, slip-

shod investigation. Therefore, the photographs remain more probative than prejudicial.

Further, Appellant was not prejudiced by the repetitive nature of the photographs. This Court has held that there is a point in the display of relevant photographs where the photographs are so duplicative that a needless repetition can inflame the jury and result in error. *President v. State*, 602 P.2d at 226. The burden is on the Appellant to prove that he was injured by the error. *Barr v. State*, 763 P.2d 1184, 1187 (Okl.Cr.1988); *Harrall v. State*, 674 P.2d 581, 583 (Okl.Cr.1984).

Appellant has failed to demonstrate that he was prejudiced in any of his substantial rights by the slight repetition of photographs. Accordingly, we find no abuse of discretion in the admission of the photographic evidence and deny this assignment of error.

Appellant contends in his eighth assignment of error that he was denied a fair trial by prosecutorial misconduct. Appellant directs this Court's attention to numerous instances during trial wherein "the prosecutor brought out irrelevant facts, made arguments which either misstated the evidence or were very misleading regarding the evidence, misstated the law, criticized defense counsel, and encouraged the jury to believe that it was its civic duty to convict the Appellant." (Appellant's Brief, pg. 56) We have carefully reviewed each of the allegations. As we have found no cause for reversal, we find it unnecessary to address each allegation separately.

Having reviewed Appellant's allegations of prosecutorial misconduct, we find that the complained of remarks did not affect the outcome of this trial and that they neither separately nor cumulatively warrant modification or reversal. From a practical standpoint, every slight excess by the prosecutor does not require that a verdict be overturned and that a new trial be ordered. *Aiuppa v. United States*, 393 F.2d 597 (10th Cir.1968). The record reveals no showing of a bad faith attempt to prejudice the jury nor an intentional emphasis upon collateral matters. Accordingly, Appellant was not denied a fair trial by the conduct or remarks of the prosecutor and this assignment is without merit.

In his ninth assignment of error, Appellant alleges that he was deprived of a unanimous verdict in both the first and second stages of trial. Appellant was charged with First Degree Malice Aforethought Murder pursuant to 21 O.S.1981, § 701.7(A), and in the alternative, First Degree Felony Murder pursuant to 21 O.S. 1981, § 701.7(B). (O.R. 276) The jury was instructed that their verdict must be unanimous but provided a verdict form which did not distinguish between the two alternatives. (Supp.O.R. 20, O.R. 329).

This issue was settled by our opinion in *James v. State*, 637 P.2d 862, 865 (Okl.Cr. 1981), *cert. denied*, 484 U.S. 970, 108 S.Ct. 467, 98 L.Ed.2d 406 (1988), and reaffirmed in *Newsted v. State*, 720 P.2d 734, 737 (Okl.Cr.1986), *cert. denied*, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986), where we held that the failure of a jury to indicate the basis of the finding of guilt was not error. Whether the offense of murder was committed with malice aforethought, or during the commission of a felony goes to the factual basis of the crime. The jury verdict was unanimous that the Appellant committed the crime. Such a verdict satisfies due process.

Appellant acknowledges our position in *Newsted* and *James* but contends that it will not survive constitutional review because the Supreme Court has held that a jury's verdict must be set aside when it may be supported on alternate grounds. However, the Supreme Court's ruling applies to those cases where the jury may have rested its verdict on the improper ground. *Mills v. Maryland*, 486 U.S. 367, 377, 108 S.Ct. 1860, 1867, 100 L.Ed.2d 384 (1988). Here, the State presented a prima facie case of both malice aforethought murder and felony murder.

Appellant contends the same problem arose during the second stage when the jury was not required to make written findings regarding Appellant's participation in the murder. Appellant alleges

this was error because the possibility existed that the jury may not have unanimously agreed on one of the required criteria necessary to be eligible for the death penalty as established in *Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 1688, 95 L.Ed.2d 127 (1987), (a defendant cannot be sentenced to death unless he displayed the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a great risk of death) and *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), (a defendant cannot be sentenced to death unless he intended the victim's death).

The jury was instructed to consider the Appellant's participation in the crime in Instruction No. 9 which provided in pertinent part:

> ... In determining whether a person found guilty of Murder in the First Degree shall be punished by death or by imprisonment for life, or imprisonment for life without parole, it is required that you give individualized consideration to the degree of participation and focus on individual culpability of a defendant in the homicidal act.
>
> You are further instructed in this regard that a jury in the State of Oklahoma may not consider the imposition of the death penalty unless the jury first determines, beyond a reasonable doubt, that the defendant killed the person, or that he attempted to kill such person, intended that such killing take place, was a major participant in the felony committed combined with a reckless indifference to human life or that lethal force should be employed. (Supp.O.R. 27).

This instruction enables the jury to give individualized consideration to the Appellant's culpability as required by the Supreme Court. Under this instruction, the jury could not recommend the death penalty without making a finding that Appellant either killed the decedent, attempted to kill her, intended that her killing take place or was a major participant in a felony committed, combined with a reckless disregard for her life. The jury's implicit finding of Appellant's participation in the murder under

this instruction together with the jury's recommendation of death, is sufficient to satisfy constitutional standards. *Cabana v. Bullock*, 474 U.S. 376, 106 S.Ct. 689, 88 L.Ed.2d 704 (1986). *See also Ruffin v. Dugger*, 848 F.2d 1512 (11th Cir.1988). Accordingly, this assignment of error is denied.

Appellant contends in his tenth assignment of error that the introduction of hearsay testimony deprived him of his right of confrontation under the constitutions of the United States and the State of Oklahoma. Appellant first complains that it was error to allow into evidence the preliminary hearing testimony of Glen Gore as the State failed to establish his unavailability as a witness.

Glen Gore was called to the witness stand by the prosecution and gave only his name before stating, "I refuse to answer any more questions whatsoever. If the Court wishes to find me in contempt, you can do so at this time and dismiss me." (Tr. 306) The trial court examined Gore and informed him that the court could order him to testify and any refusal to testify would be subjecting himself to contempt proceedings by the court. Gore indicated that he understood but remained adamant in his refusal to testify. The trial court declared Gore unavailable as a witness pursuant to 12 O.S.1981, § 2804(A)(2), and his preliminary hearing testimony was read to the jury.

Title 12 O.S.1981, § 2804(B)(1), provides that testimony given as a witness at another hearing of the same proceeding is not excluded by the hearsay rule if the declarant is unavailable as a witness. Title 12 O.S.1981, § 2804(A)(2), provides that a witness is unavailable if he persists in refusing to testify despite an order of the court to do so. However, a declarant is not unavailable as a witness if his refusal, or inability to testify is due to an act of the proponent of his statement for the purpose of preventing the witness from attending or testifying.

Appellant presents a two fold argument why the State cannot rely on this section as support for introducing the pre-

**403**

liminary hearing transcript. Initially, Appellant argues that the State did not establish Gore was unavailable as it did not ascertain the exact reason why he refused to testify. Further, Appellant argues that it can be inferred from the record that Gore refused to testify out of fear of reprisal from inmates at the Department of Corrections. Therefore, the State as the proponent of Gore's testimony had an affirmative duty to take steps to remove any obstacles from his testimony. Appellant fails to cite any legal authority to support either argument.

Appellant is correct in stating that the State has the burden of demonstrating the actual unavailability of the witness. *Ybarra v. State*, 733 P.2d 1342, 1345 (Okl.Cr. 1987). But Appellant has failed to show that the State did not meet that burden in the instant case. Section 2804(A)(2) does not state that the court must ascertain the specific reasons behind a refusal to testify before the witness may be declared unavailable, nor does this section provide that a witness may be declared unavailable only upon showing of good and valuable reasons for refusing to testify. Further, the section has not been interpreted as placing an affirmative duty on the State to elicit the reasons behind a witness' refusal to testify. To place such a burden on the court or the State would be contrary to the purpose of Subsection 2 as it applies to witnesses like Mr. Gore who refuse to testify and refuse to explain further.

Assuming that Gore's refusal to testify was based upon what the Appellant terms "institutional anti-snitch bias from the prison system in which he was incarcerated" (Appellant's brief pg. 71), Appellant has failed to show that his refusal to testify was based upon an act of the State. Section 2804 is narrowly drafted to prevent a party from relying on the unavailability of a witness where the proponent has committed acts for the purpose of preventing the witness from testifying. We agree with the State's interpretation of this section that a nexus between the proponent's intentional act and the witness' refusal to testify must be established. Here, the

State did not intentionally commit acts calculated to cause Gore to refuse to testify.

Appellant suggests that the State was responsible for providing him with sufficient protection to enable him to testify without fear. However, Appellant has not shown that the State did not take measures to ensure Mr. Gore's testimony just to have him refuse to testify at the last minute. Moreover, it is doubtful if the State could adequately comply with such a subjective request as Appellant suggests. Appellant's argument would place an unrealistic burden on the State. One which is not supported in the law. Therefore, we find that Glen Gore was properly declared to be unavailable to testify and his preliminary hearing testimony was properly admitted into evidence.

Appellant next alleges error in the admission of two statements made by the decedent. The first statement was presented through the testimony of Glen Gore who testified at the preliminary hearing that during the early morning hours of December 8, 1982, shortly before closing time at the Coachlight, Debbie Carter approached him and asked him to rescue her because the Appellant was "bugging her". When this testimony was read to the jury, defense counsel objected to the statement as inadmissible hearsay. The prosecutor responded that the statement was offered to show the decedent's state of mind and that the statement was made in the presence of the Appellant. The trial court overruled the defense objection and admitted the statement. (Tr. 330–331)

The trial court correctly allowed the testimony under the state of mind exception to the hearsay rule. 12 O.S.1981, § 2803(3). Such antecedent declarations by a decedent are admissible in a case of homicide to show the decedent's state of mind toward the defendant or to supply the motive for killing. *Moore v. State*, 761 P.2d 866, 870 (Okl.Cr.1988); *Rawlings v. State*, 740 P.2d 153, 162 (Okl.Cr.1987); *Spuehler v. State*, 709 P.2d 202, 204 (Okl.Cr.1986); *Stedman v. State*, 568 P.2d 350, 352 (Okl. Cr.1977); *Sallee v. State*, 544 P.2d 902, 907 (Okl.Cr.1976). Here, the testimony con-

cerning the decedent's apprehension of Appellant provided an insight into her state of mind. The decedent's state of mind is relevant to proving the identity of her assailant in as much as the Appellant denied knowing or ever meeting the decedent. In addition to showing that Appellant was at the Coachlight Club on December 8, 1982, the testimony also reflects the decedent's rebuff of Appellant which is relevant in proving a motive for the killing. Therefore, Gore's testimony explaining why the decedent asked for his help was properly admitted.

■■■■ The second statement, admitted over defense counsel's objections, came through the testimony of Gina Vietta. Ms. Vietta testified that Debbie Carter had asked her to trade work stations at the Coachlight Club because the decedent did not feel comfortable around the Appellant; that he had made a pass at her. The State concedes that under our rulings in *Moore v. State*, 761 P.2d 866, 870 (Okl.Cr.1988), and *Wadley v. State*, 553 P.2d 520, 524–525 (Okl.Cr.1976), this is an inadmissible hearsay declaration referring to the defendant's past acts. However, the State argues that the error was not prejudicial as the isolated mention of the Appellant making a pass at the decedent could not have prejudiced the jury against the Appellant in light of the other overwhelming evidence.

We agree that it was error to have admitted the statement. In *Moore* we explained:

> The testimony should have been excluded. The rationale behind the exclusion of testimony about antecedent acts is that the declarant's state of mind is so intertwined with the act itself that only a superhuman effort can unravel the declarant's state of mind from the truth of the matter asserted in the act. 761 P.2d at 871.

However, as we also found in *Moore,* in light of the strong evidence of guilt, we cannot say that there was a reasonable possibility that the evidence complained of might have contributed to the conviction. *Chapman v. California*, 386 U.S. 18, 87

S.Ct. 824, 17 L.Ed.2d 705 (1967). Accordingly, this assignment of error is denied.

■■■ In the twelfth assignment of error, Appellant alleges error in the admission of expert witness Melvin Hett's testimony calling it unreliable and an invasion of the jury's province to decide the ultimate issues of fact.

Melvin Hett testified at trial that hairs found on the bedding were analyzed and determined to be "consistent microscopically and could have the same source as the Appellant's known pubic hair." He also testified that hairs removed from the washcloth were compared to the Appellant's hair and found to be "consistent microscopically and could have the same source" as scalp hairs from the Appellant. (Tr. 733) Mr. Hett later explained that the term "microscopically consistent and could have the same source" are terms of art which mean that "the hairs did originate from that source, or there could be or might be another individual in the world somewhere that might have the same microscopic characteristics. In other words, hairs are not absolute identification...." (Tr. 735) On cross-examination, Mr. Hett again testified that hairs are not absolute personal identification. (Tr. 767–770)

Appellant compares this testimony to that condemned in *McCarty v. State*, 765 P.2d 1215, 1214 (Okl.Cr.1988). In *McCarty*, testimony that was held improper was the opinion of the expert witness that the defendant was in "very close and possible violent contact with the victim" to have left the hair evidence on the body. And testimony that the defendant "was in fact there [the crime scene]." This was found to be improper expert opinion as it was beyond the present state of the art of forensic science and beyond the personal knowledge of the expert witness. Hett's testimony in the instant case is distinctly different as it was well within the present scope of scientific capability and not merely a personal expression of guilt. Reading his testimony in its entirety, it clearly left the ultimate issues of fact with the jury.

Appellant questions the validity of this scientific evidence however, and argues

that hair analysis is one of the most unreliable of all scientific tests. Appellant acknowledges our previous acceptance of hair analysis but urges this Court to reconsider its position in light of mounting indications that such evidence does not meet sufficient standards of scientific reliability. To support his argument, Appellant cites to the results of approximately four (4) scientific studies.

We are not persuaded by Appellant's argument or authorities. We remain committed to our position as expressed in *Driskell v. State*, 659 P.2d 343, 356 (Okl.Cr.1983), which sanctioned the use of hair comparison evidence and the determination that any question about the procedures and conclusions drawn therefrom should be raised on cross-examination. Accordingly, this assignment of error is denied.

### III. ISSUES RELATING TO PUNISHMENT

Appellant contends in the thirteenth assignment of error that insufficient evidence was presented to support the death penalty. The jury found the existence of three aggravating circumstances; that the murder was especially heinous, atrocious or cruel; that there existed a probability that the Appellant would commit criminal acts of violence that would constitute a continuing threat to society; and that the murder was committed for the purpose of avoiding or preventing lawful arrest or prosecution.

The evidence supporting a finding that the murder was especially heinous, atrocious or cruel requires proof that the death was preceded by torture or serious physical abuse. *Fox v. State*, 779 P.2d 562, 576 (Okl.Cr.1989); *Fowler v. State*, 779 P.2d 580, 588 (Okl.Cr.1989); *Nguyen v. State*, 769 P.2d at 174; *Rojem v. State*, 753 P.2d at 369; *Stouffer v. State*, 742 P.2d 562, 563 (Okl.Cr.1987) (Opinion on Rehearing), *cert. denied*, 484 U.S. 1036, 108 S.Ct. 763, 98 L.Ed.2d 779 (1988). Debbie Carter died from a combination of a ligature tightened around her neck and a washcloth stuffed down her mouth. The evidence shows that she fought for her life as she suffered numerous bruises on her body, arms and face, small puncture wounds on her face, cuts inside her mouth and lips. She was also bruised around her vagina and rectum and a metal bottle cap was found inside her rectum. All of these wounds were inflicted while Debbie Carter was still alive.

Appellant argues that under our decision in *Nguyen*, the degree of the victim's suffering is not sufficient to support this aggravating circumstance. In *Nuckols v. State*, 690 P.2d at 472, we stated that the manner of killing, as evidenced by the circumstances surrounding the murder and the killer's attitude, is a relevant consideration as well as the suffering of the victim. *See also Liles v. State*, 702 P.2d 1025, 1032 (Okl.Cr.1985), *cert. denied*, 476 U.S. 1164, 106 S.Ct. 2291, 90 L.Ed.2d 732 (1986), on post-conviction *cert. denied*, 484 U.S. 933, 108 S.Ct. 308, 98 L.Ed.2d 266 (1987), *reh. denied*, 484 U.S. 1021, 108 S.Ct. 738, 98 L.Ed.2d 685 (1988).

In the present case, Appellant forced his way into the decedent's home, breaking the glass around the front door, overcame her attempts to resist his advances, raped and killed her. Upon this evidence, we find that Debbie Carter's murder was especially heinous, atrocious or cruel; that she suffered serious, physical abuse or torture; and that the jury's finding of this particular aggravating circumstance was based on substantial uncontradicted evidence.

In evaluating whether there is a probability that the defendant will commit acts of violence which will constitute a continuing threat to society, we have held that the murder for which the defendant was convicted can be considered as supporting evidence. *Fox*, 779 P.2d at 577; *Fowler*, 779 P.2d at 589; *Liles v. State*, 702 P.2d 1025, 1031 (Okl.Cr.1985); *Robison v. State*, 677 P.2d 1080, 1088 (Okl.Cr.), *cert. denied*, 467 U.S. 1246, 104 S.Ct. 3524, 82 L.Ed.2d 831 (1984); *Stafford v. State*, 665 P.2d 1205, 1217 (Okl.Cr.1983), *vacated*, 467 U.S. 1212, 104 S.Ct. 2651, 81 L.Ed.2d 359 (1984), *affirmed on remand*, 700 P.2d 223 (Okl.Cr.), *cert. denied*, 474 U.S. 865, 106 S.Ct. 188, 88 L.Ed.2d 157 (1985). These cases addressed

the characteristic of callousness as reflected by the defendant's actions.

■ This aggravating circumstance may also be proved by evidence of unadjudicated criminal acts. *Johnson v. State,* 731 P.2d 993 (Okl.Cr.1987). Four (4) witnesses testified to prior acts of violence by the Appellant. B.S. testified that one evening between 10:30 and 11:00 p.m. she heard someone outside her son's bedroom window. Looking out, she saw the Appellant staring in the window and he said he knew she was in there and he was going to get her. B.S. ran to her living room to call for help when she heard the back screen door being jerked on. A friend soon arrived to help B.S. and the two of them walked outside to where the Appellant had been standing. No one was there, but the ground underneath the window was covered in footprints. Footprints were also discovered surrounding the back door and the latch on the screen door had been pulled from the wooden door frame.

L.B. testified that in June 1982, she was in the club at the Holiday Inn in Norman, Oklahoma when she met the Appellant and Dennis Fritz. Fritz asked L.B. if she would like to join him in his car where he had his own bar. Refusing his request, she visited with friends in the band until closing time. As she was leaving the club, Fritz again asked if she would like to see his private bar. Leaning in the window of the car, Fritz told her she would have to set in the car to actually see the bar. When she did, Fritz began to drive slowly away. When L.B. asked what was going on, Fritz sped up. When she asked to be let out, Fritz sped up again. L.B. began to repeat her request to be freed. Her constant requests upset the Appellant, riding in the passenger seat, and he repeatedly told her to "shut up." (Tr. 973) After a while the car began to stall on the rain soaked road and L.B. opened the door and jumped out. Fritz and the Appellant chased her for a ways but then drove off.

L.C. testified that one evening in late 1982 or early 1983 she was working in her flower garden when the Appellant walked up to her house and sat down on her porch.

He was drinking a beer and wanted her to stop her work and visit with him. When she refused, Appellant grabbed her by the wrists, and threw her up against the side of the house. After a brief struggle, she was able to break loose and run inside the house.

A.H. testified that she met the Appellant through a friend. One evening, the Appellant was at her house visiting when he decided to leave for the Coachlight Club. He asked A.H. to accompany him but she refused and the Appellant left. He returned a few minutes later however, asking for his cigarettes which he had left on her table. When she turned to get the cigarettes, the Appellant forced his way into her home. Telling her that "girls like [her] should share themselves with guys and not keep it to themselves", he knocked her to the floor and threatened to rape her. (Tr. 987) This began a five hour assault during which time A.H. was raped and would receive two black eyes, numerous cuts and bruises and small puncture wounds to her face. Appellant repeatedly told her that if she did not cooperate with him, he would kill her. A.H. was able to calm the Appellant down for a short time, but he soon became angry and proceeded to bang her head against the wall. She promised not to tell anyone about the assault if he would leave. At approximately 3:00 a.m. the Appellant finally left her house. A.H. never reported the incident to the police because the Appellant lived only two houses down from her and she was afraid that he would come back and kill her.

The evidence of Appellant's prior unadjudicated acts of violence as testified to by B.S., L.B., L.C. and A.H., together with the callous nature in which Appellant killed Debbie Carter, support the jury's finding of the continuing threat aggravating circumstance.

■ Finally, the existence of the aggravating circumstance that the murder was committed to avoid lawful arrest or prosecution is determined by looking at the killer's intent. *Fox,* 779 P.2d at 576; *Fowler,* 779 P.2d at 588; *Stouffer v. State,* 738 P.2d 1349 at 1361–1362 (Okl.Cr.1987); *Moore v.*

*State*, 736 P.2d at 165. In the absence of his own statements of intent, such evidence may be inferred from circumstantial evidence. *Rojem*, 753 P.2d at 368; *Banks v. State*, 701 P.2d 418 (Okl.Cr.1985), *cert. denied*, 486 U.S. 1036, 108 S.Ct. 2024, 100 L.Ed.2d 611 (1988).

■■■ The evidence indicates that Debbie Carter knew the Appellant and could have identified him as her rapist. Terri Holland testified that Appellant stated that he "tried to go with Debbie Carter, and she wouldn't have nothing to do with him. And he said that if she would just went ahead and went with him, he'd never had to kill her." (Tr. 574) A.H. testified that during his assault upon her, the Appellant stated that he was going to have to kill her if she did not cooperate. It was only after repeated assurances that she would not report the rape that Appellant left her home. This evidence tends to prove that Appellant sought to leave no witnesses to his violent conduct, especially ones that would not cooperate with him and that could identify him. This evidence was sufficient to support the aggravating circumstance that Appellant killed Debbie Carter with the intent to avoid lawful arrest or prosecution.

■■■ In his fourteenth assignment of error, Appellant alleges that his death sentence should be vacated because at the time of Debbie Carter's murder, the aggravating circumstance "especially heinous, atrocious or cruel" was unconstitutionally vague. Debbie Carter was murdered on December 8, 1982. In 1987 the aggravating circumstance of "especially heinous, atrocious and cruel" was held to be overly broad and vague in *Maynard v. Cartwright*, 822 F.2d 1477 (10th Cir.1987), aff'd in *Maynard v. Cartwright*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). This Court narrowed the interpretation of that particular aggravating circumstance in *Stouffer v. State*, 742 P.2d at 562–563. The judicially restricted interpretation was applied to a murder committed in 1985.

In *Castro v. State*, 749 P.2d 1146, 1150 (Okl.Cr.1988), (Opinion on rehearing) we considered whether the retroactive applica-

tion of the narrowed interpretation was a violation of the *ex post facto* clause. We determined that the narrowing of the aggravating circumstance was not an *ex post facto* violation as it did not criminalize conduct which was innocent when done, nor make the crime greater than it was when committed, nor change the punishment to be meted out. Rather, it was a procedural change in our "statutory capital sentencing scheme which simply alter 'the methods employed in determining whether the death penalty was to be imposed.... even though it may work to the disadvantage of a defendant.' ", it was not an *ex post facto* violation. 749 P.2d at 1150, quoting *Dobbert v. Florida*, 432 U.S. 282, 293–294, 97 S.Ct. 2290, 2298, 53 L.Ed.2d 344 (1977).

Likewise in the present case, we find it is not unconstitutional to apply the narrowed interpretation of "especially heinous, atrocious or cruel" aggravating circumstance to the Appellant. In fact, this restricted application ensures individual consideration of the facts in Appellant's case and precludes an arbitrary or unsupported imposition of the death penalty.

■■■ In the fifteenth assignment of error, Appellant claims that our narrowed interpretation of the "especially heinous, atrocious or cruel" aggravating circumstance focusing on serious physical abuse or torture is unconstitutionally vague because a reasonable juror could believe that the mere fact that person was killed means serious physical abuse.

The jury in the present case was instructed verbatim from the Oklahoma Uniform Jury Instructions–Criminal, No. 436. The identical instruction was given in *Stouffer*. In discussing the narrowed interpretation we stated that "the objective guidance given to the jury by this instruction is that of the second paragraph limiting its application to instances of death preceded by torture or serious physical abuse. Otherwise, the language could include many murders." 742 P.2d at 563. We are not persuaded by Appellant's arguments to change our position.

The instruction, when read in its entirety, adequately channels the jury's discretion to specific class of murders which may justify the death penalty. The jury is instructed that in determining if the murder was especially heinous, atrocious or cruel it must find that the murder was shockingly evil, outrageously wicked or vile, pitiless or designed to inflict a high degree of pain and then further limit that definition only to a murder preceded by serious physical abuse or torture. Accordingly, this assignment of error is without merit.

■ Appellant contends in his sixteenth assignment of error that he was not provided adequate notice of the second stage testimony of A.H. Specifically, Appellant argues that he was not informed that the witness would testify that during an attack by the Appellant she suffered small puncture wounds on her face as a result of the Appellant's horse-head ring.

■ Appellant has waived consideration of this allegation except for fundamental error review by his failure to object at trial. The failure to object to lack of notice, either at a pre-trial hearing or at the time the challenged evidence is offered will result in a waiver of his statutory right. *Green v. State*, 713 P.2d 1032, 1038 (Okl.Cr.1985), *cert. denied*, 479 U.S. 871, 107 S.Ct. 241, 93 L.Ed.2d 165 (1986).

Title 21 O.S.1981, § 701.10, provides that during the penalty phase of trial only such evidence in aggravation as the State has made known to the defendant prior to his trial shall be admissible. This statute, together with Okla. Const. art. II, § 20, contemplates that a defendant in a murder case be given a summary of the evidence intended to support the alleged aggravating circumstances, and a list of witnesses the State might call. *Walker v. State*, 723 P.2d 273, 285 (Okl.Cr.), *cert. denied* 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 600 (1986). The purpose of notice prior to trial is to allow the defendant time to present a defense or an explanation for alleged criminal misconduct. *Johnson v. State*, 665 P.2d 815, 823 (Okl.Cr.1982).

In *Wilson v. State*, 756 P.2d 1240, 1245 fn. 1 (Okl.Cr.1988), we said that the State is not required to give a detailed description of the evidence that will be offered in order to meet the statutory notice of Section 701.-10.

The notice filed by the State provided in part:

Testimony from A.C. who will testify that in January of 1981 Ronald Keith Williamson came to her house with a man she knew who lived across the street from her. They stayed thirty minutes and left. An hour later Ronald Keith Williamson returned and said he left his cigarettes. She left him outside the door with the door slightly open. While she went to find the cigarettes he then came in, talked with her a little, then grabbed her tearing her shirt off. He told her he was going to rape her, grabbed her and threw her face down on the floor. He beat her up and fondled her. He took his clothes off and told her if she didn't quit screaming and fighting he would kill her. For a while she could calm him down then he would attack her again. This went on for 4 hours until he left her home at 2:00 a.m. (O.R. 319)

This notice adequately complied with the requirements of Section 701.10 and afforded the Appellant the opportunity to prepare his defense. The failure to mention details, such as the cause of the puncture wounds, is not error. Accordingly, this assignment of error is denied.

■ In the eighteenth assignment of error, Appellant contends the trial court erred by instructing the jury not to allow sympathy, sentiment, or prejudice to enter into its deliberations. Appellant argues that giving this instruction improperly limits the jury's consideration of mitigating evidence and emotional responses to it.

This identical argument was rejected by the United States Supreme Court in *Saffle v. Parks*, 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990). In affirming the use of anti-sympathy instruction the Court stated that it is constitutionally permissible, if not constitutionally required, for the State to insist that "the individual assessment of the appropriateness of the death penalty be

a moral inquiry into the culpability of the defendant, and not an emotional response to the mitigating evidence." 110 S.Ct. at 1262, quoting *California v. Brown,* 479 U.S. 538, 545, 107 S.Ct. 837, 841, 93 L.Ed.2d 934 (1987). "The State must not cut off full and fair consideration of mitigating evidence; but it need not grant the jury the choice to make the sentencing decision according to its own whims or caprice." *Id.,* 110 S.Ct. at 1263.

This Court also rejected this argument in *Fox v. State,* 779 P.2d at 574. Relying on *California v. Brown,* we stated that what was prohibited by the instruction, and what would be understood by a reasonable juror as being prohibited were "emotional responses not rooted in the aggravating and mitigating evidence introduced during the penalty phase." *Id,* 479 U.S. at 542, 107 S.Ct. at 840.

The instruction in the instant case was identical to the one given in *Fox.* Therefore, for the reasons stated in *Saffle v. Parks,* and *Fox,* we find it was not error to give the anti-sympathy instruction. *See also Moore v. State,* 788 P.2d 387, 401 (Okl.Cr.1990). This assignment of error is denied.

▄▄ In his nineteenth assignment of error, Appellant contends that the jury was instructed that it could ignore any mitigating evidence. The jury was informed in Instruction Number 7:

> Mitigating Circumstances are those which, in fairness and mercy, may be considered as extenuating or reducing the degree of moral culpability or blame. The determination of what are mitigating circumstances is for you as jurors to resolve under the facts and circumstances of this case. (Supp.O.R. 24)

Appellant claims that the term "may be considered" allows the jury to disregard mitigating evidence. We disagree.

▄▄ We must first note that counsel failed to enter an objection to this instruction and has therefore waived all but fundamental error review. *Nealy v. State,* 636 P.2d 378, 382 (Okl.Cr.1981). In *Nealy* this Court reiterated the well established rule that jury instructions must be read as a whole and not in isolation. This applies to the second stage instructions of a bifurcated trial as well as the instructions in a non-bifurcated trial.

In the present case, in addition to the above instruction, the jury was also instructed that the law sets forth "certain minimum mitigating circumstances you shall follow as guidelines in determining which sentence" to impose. The jury was further informed that "you shall consider any or all of the minimum mitigating circumstances which you find apply to the facts and circumstances of this case." The jury was told that they need not limit their consideration to the specifically listed mitigating factors and may consider additional mitigating evidence. Eight (8) specific mitigating factors were then listed including: 1) the defendant has no significant history of prior criminal activity; 5) the defendant was an accomplice in a murder committed by another person and his participation in the homicidal act was relative minor; 6) the defendant acted under the duress or under the domination of another person; 7) at the time of the murder, the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or intoxication. (Supp.O.R. 25–26)

Reading the second stage instructions as a whole, it is clear that the jury was not told to disregard any mitigating evidence. In fact, they were specifically directed that evidence of Dennis Fritz' involvement in the murder and evidence that Appellant only dreamed that he committed the murder must be considered as mitigating evidence. Therefore, we find the jury was adequately instructed on the mitigating evidence and this assignment of error is denied.

▄▄ Appellant contends in his twentieth assignment of error that his death sentence must be vacated because the trial court's instructions concerning the manner in which the jury was to weigh the aggravating and mitigating circumstances set forth an improper burden of proof. Title 21 O.S.

1981, § 701.11, provides that the State must prove the existence of at least one aggravating circumstance beyond a reasonable doubt before the jury is authorized to consider the death penalty. However, we have refused to expand this by establishing specific standards for the balancing of the aggravating and mitigating circumstances. *Fox v. State*, 779 P.2d at 573; *Walker v. State*, 723 P.2d at 284, *Brogie v. State*, 695 P.2d 538, 544 (Okl.Cr.1985); *Cartwright v. State*, 695 P.2d 548, 555 (Okl.Cr.1985); *Jones v. State*, 610 P.2d 818, 820 (Okl.Cr. 1980). Federal constitutional considerations do not require a different result. *Franklin v. Lynaugh*, 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988); *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). Therefore, this assignment of error is denied.

■ In his twenty-first assignment of error, Appellant alleges it was error for the trial court to fail to instruct the jury that it had the option to return a verdict of life, notwithstanding a finding that the aggravating circumstances outweighed the mitigating evidence. In *Walker v. State*, 723 P.2d at 284, we discussed "jury nullification" or the inherent power of the jury to bring in a verdict of acquittal "in the teeth of both law and fact." Quoting *Horning v. District of Columbia*, 254 U.S. 135, 138, 41 S.Ct. 53, 54, 65 L.Ed. 185 (1920). We stated that in capital cases, an instruction on this issue would inform the jury of its right to return a sentence of life no matter how great the weight of evidence supporting the aggravating circumstance. We noted however, that the courts have almost uniformly held that a criminal defendant is not entitled to such an instruction. Although a trial judge may, in the exercise of his sound discretion, give such an instruction, it is not error for him to refuse the request. *See also Fox v. State*, 779 P.2d at 573. Therefore, we find that the absence of such instruction does not constitute error.

■ Appellant alleges in his seventeenth assignment of error that the "continuing threat" aggravating circumstance is applied in an arbitrary and unconstitutional manner. The constitutionality of this aggravating circumstance has been upheld by the United States Supreme Court in *Barefoot v. Estelle*, 463 U.S. 880, 896–899, 103 S.Ct. 3383, 3396–3397, 77 L.Ed.2d 1090 (1983), and by this Court in *Fox v. State*, 779 P.2d at 576; *Munson v. State*, 758 P.2d at 335; *Castro v. State*, 745 P.2d 394 at 407 (Okl.Cr.1987); *Smith v. State*, 737 P.2d 1206, 1215 (Okl.Cr.1987); *Fisher v. State*, 736 P.2d 1003, 1009 (Okl.Cr.1987), *affrm'd on rehearing*, 739 P.2d 523 (Okl.Cr.1987), *cert. denied*, 486 U.S. 1061, 108 S.Ct. 2833, 100 L.Ed.2d 933 (1988), *reh. denied*, 487 U.S. 1246, 109 S.Ct. 3, 101 L.Ed.2d 955 (1988); *Walker v. State*, 723 P.2d at 285; *Newsted v. State*, 720 P.2d at 739; *Van-Woundenberg v. State*, 720 P.2d 328, 337 (Okl.Cr.1986), *cert. denied*, 484 U.S. 1036, 108 S.Ct. 763, 98 L.Ed.2d 780 (1988); *Ross v. State*, 717 P.2d 117, 123 (Okl.Cr.1986); *Stafford v. State*, 669 P.2d 285 at 299 (Okl.Cr.1983); *Stafford v. State*, 665 P.2d at 1218.

In reviewing these cases and the application of this particular aggravating circumstance, we find that the phrase "the existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society" is clear and does not require further definition. The phrase directs the jury to examine the Appellant's conduct in the offense for which he was just convicted as well as any other relevant statements and conduct in relation to the safety of society as a whole. Accordingly, this assignment of error is denied.

## IV. ISSUES RELATING TO EFFECTIVE ASSISTANCE OF COUNSEL

■ In the second assignment of error, Appellant alleges that he received ineffective assistance of counsel during both stages of trial. It is well established that an accused has a fundamental right to the reasonably effective assistance of counsel, regardless of whether counsel is appointed or retained. U.S. Const. amend. VI, XIV; Okla. Const. art. II, § 20. The standard for evaluating whether an accused received

effective assistance of counsel was set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The Supreme Court provided a two-part test which must be applied to determine whether a defendant has been denied effective assistance of counsel. First, the defendant must show that counsel's performance was deficient, and second, he must show the deficient performance prejudiced the defense. Unless the defendant makes both showings, "it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687, 104 S.Ct. at 2064. This same test applies to a capital case as well as a non-capital case. *Liles v. State,* 702 P.2d at 1034.

In hearing a claim of ineffectiveness of counsel, the reviewing court must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. The defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. *Strickland,* 466 U.S. at 694–696, 104 S.Ct. at 2070, 80 L.Ed.2d at 699. The burden rests with the Appellant to show that there is a reasonable probability that, but for any unprofessional errors by counsel, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.,* 466 U.S. at 698, 104 S.Ct. at 2070. This Court has stated that the issue is whether counsel exercised the skill, judgment and diligence of a reasonably competent defense attorney in light of his overall performance. *Fisher v. State,* 736 P.2d at 1011 (Okl.Cr.1987), *Cotton v. State,* 679 P.2d 1305, 1308 (Okl.Cr.1984).

Appellant argues that he was denied effective assistance of counsel during the first stage of trial by counsel's failure to introduce into evidence the confession of Ricky Simmons, and by counsel's failure to fully investigate and utilize evidence of Appellant's mental illness.

During the investigation, Agent Rogers took a statement from Ricky Simmons wherein Simmons confessed to the murder of Debbie Carter. The video-taped confession is a rambling, confusing and often contradictory narrative in which Simmons confesses to breaking into the decedent's apartment, raping her and killing her. He gives several different versions of how he got into her apartment and of how he killed her. Simmons admitted that he is a heavy drug user and explained that his belief that he killed the decedent could have been a drug induced illusion or a dream.

The prosecution made the tape available to the defense prior to trial. Defense counsel did not attempt to introduce the confession into evidence but utilized it on cross-examination. A review of the trial transcript shows that counsel's defense strategy was to discredit the State's investigation of the Carter homicide and leave the jury with the impression that such a poorly conducted investigation could not have possibly produced reliable results. Witnesses would then be presented, including the Appellant, to testify that Appellant had no part in the murder and never confessed to the crime. The Simmons confession was used to bolster the defense theory that the State's investigation was poorly conducted and unreliable.

During the cross-examination of Agent Rogers, counsel inquired as to statements the agent had taken from suspects in the case. Rogers stated that in addition to taking statements from the Appellant and Dennis Fritz, he had also taken a statement from Ricky Simmons in September 1987. It was noted that the statement was video-taped, was approximately two (2) hours in length and could be presented to the jury verbatim. The State objected to any mention that the tape could be introduced, stating that it was made at a polygraph examination and therefore could not be introduced into evidence. The trial court sustained the objection. (Tr. 485–486)

Counsel continued his cross-examination by inquiring as to the procedure used in taking Appellant's statement. It was revealed that, although he had the capability to video-tape the Appellant's statement, Agent Rogers used pencil and paper to

take it down. In closing argument, defense counsel again highlighted the difference in procedures and questioned why investigators would tape one statement but not that of a person who had been a potential suspect in the case for four and one half years. (Tr. 881–883)

 The evidence to be introduced and the theory of defense are matters of trial strategy and we will not second guess trial strategy on appeal. *Smith v. State*, 650 P.2d 904, 908 (Okl.Cr.1982). Here, the trial court blocked any attempt by defense counsel to actually introduce the confession into evidence by ruling it was the product of a polygraph examination and therefore inadmissible.

A review of the videotape does not reflect that it was made at a polygraph examination. Assuming arguendo that it was not prepared in conjunction with a polygraph, it was potentially admissible as a third party confession under *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). Regardless of whether the videotape was properly admissible at trial, counsel was not ineffective for failing to seek its admission. During the interview investigators, after listening for approximately one hour to Simmons' story, told him it was their opinion that he did not kill the decedent and that his participation in the crime was all in his mind. Keeping the rambling narrative and the investigator's comments from the jury gave the confession more credibility than it might have had otherwise and allowed the defense to argue that someone other than Appellant committed the murder. Further, Appellant was not prejudiced by the absence of the confession as introducing the confession would have allowed the State the opportunity to present evidence that Ricky Simmons had been excluded as a suspect based upon the results of hair analysis.

 Appellant further alleges that counsel failed to fully investigate and utilize his mental health history. In his motion to supplement the record on appeal, Appellant includes an affidavit from defense counsel concerning his conduct at trial and numerous reports and letters from mental health professionals concerning his mental health history. In his affidavit defense counsel states that he deliberately chose not to pursue the issue of Appellant's mental health for either an insanity defense or for mitigation of punishment based upon information he received from mental health professionals and the conduct of the Appellant. Counsel further stated that he had requested that he be allowed to withdraw from his representation of Appellant due to Appellant's unpredictable and often violent behavior, but the request was denied. Counsel noted that he was aware the Appellant was being given thorazine prescribed by Dr. Snow, a local psychiatrist. He stated that Appellant usually behaved well during his visits to the county jail. On a few occasions, however, he appeared drowsy and counsel became concerned that Appellant was over medicated and requested that his dosage of thorazine be reduced.

Information from mental health professionals upon which counsel relied in part in making his decision is also included in the supplemental record. This information comes from Dr. Garcia, Chief Forensic Psychiatrist at Eastern State Hospital; Mental Health Services of Southern Oklahoma; and the Pontotoc County Health Department.

The information from Dr. Garcia was in the form of a letter dated October 1, 1985, and concerned Appellant's competency to stand trial in another case from Pontotoc County, Case No. CRF–84–218. The letter reflects that Dr. Garcia found the Appellant competent and able to appreciate the nature of the charges against him and able to assist his counsel.

Norma Walker, a social worker with Mental Health Services of Southern Oklahoma responded to defense counsel's inquiry about Appellant. In a letter dated July 16, 1987, she summarized Appellant's treatment by the Health Service. Ms. Walker stated that Appellant's first contact with the clinic was in November 1980, when he voluntarily appeared for treatment for alcohol and drug abuse. Over the

next seven years Appellant periodically returned to the clinic seeking assistance. Each time, the clinic would counsel Appellant and formulate a recovery program. However, Appellant would not abide by the programs provided and repeatedly failed to keep follow-up appointments with counselors at the clinic. Ms. Walker added that Appellant had been suspected by each counselor who saw him of "shamming, malingering, attempting to manipulate the system". Although there could be neurological damage or organic brain syndrome, she added that the Appellant may know how to feign thought disorder. As an outpatient facility, the clinic was not equipped to rule out those conditions.

Defense counsel also possessed a psychological report prepared by the Pontotoc County Health Department which reflected the results of an evaluation conducted on September 22, 1987, by Claudette Ray, Clinic Director, Guidance Clinic. The report indicated that Appellant possessed normal intelligence and sufficient skills to meet the ordinary demands of daily life, including personal care, social interaction, job performance and money management. Ms. Ray added that Appellant was consciously anxious due to situational stress, and that he may behave inappropriately, such as not attending a preliminary hearing which would benefit him.

Also included in the supplemental record are affidavits from nine (9) health care professionals who treated Appellant at various times from 1979 until the time of trial. The affidavits also state that the authors would have testified at trial if they had been called. Trial counsel was not aware of the information contained in the affidavits at the time of trial.

It is important to note that this is not a proceeding to determine Appellant's competency. Appellant has not challenged his competency to stand trial. Appellant has alleged that he was denied a fair trial by counsel's failure to present this evidence to the jury. Therefore, this is strictly a review of defense counsel's performance.

In assessing an Appellant's claim of ineffective assistance of counsel, the reviewing court must judge the reasonableness of counsel's conduct on the facts of the case at hand and *evaluate the conduct from counsel's perspective at the time. Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. Every effort must be made to eliminate the distorting effects of hindsight. We are to determine whether, in light of all the circumstances of the case, the identified acts or omissions were outside the wide range of professionally competent assistance. *Id.*, 466 U.S. at 695, 104 S.Ct. at 2068.

"[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–691, 104 S.Ct. at 2066. In other words, counsel has a duty to make reasonable investigations or to make reasonable decisions that make particular investigations unnecessary. In any effectiveness case, a particular decision not to investigate must be directly assessed for reasonableness under all the circumstances, applying a heavy measure of deference to counsel's judgments. *Id.*

Trial counsel was a seasoned lawyer, well versed in the criminal law. At the time of trial, he had the opinions of three mental health professionals that Appellant was competent and a malingerer. Counsel had been appointed to represent Appellant approximately one year before trial. Although the number of personal consultations counsel had with Appellant is not documented, the record does reflect numerous visits with Appellant in the county jail and several visits with members of his family. Counsel was well aware of Appellant's past and present mental condition.

Based upon this information, counsel was not ineffective for failing to investigate further. We will not require counsel to continue to investigate and collect medical reports until he finds one that reports the Appellant incompetent. Counsel's re-

liance upon the information in his possession was reasonable given the totality of the circumstances and when counsel's strategy represents a reasonable choice based upon those assumptions, counsel need not investigate lines of defense that he has chosen not to employ at trial. *Strickland*, 466 U.S. at 681, 104 S.Ct. at 2061. Under these facts, counsel's strategic choice to forego a defense based upon his mental health was well within the range of professionally reasonable judgments, and the decision not to seek more psychological evidence than was already in hand was likewise reasonable.

With respect to the prejudice component, Appellant has failed to show that there is a reasonable probability that the outcome of the case would have been different. A review of the information contained in the nine (9) affidavits not previously presented reveals that all the reports, save one, describe the Appellant as competent but immature with a personality disorder and a history of drug and alcohol abuse. The only report which finds Appellant with a diminished mental capacity is from Norma Walker at the Mental Health Services of Southern Oklahoma. This report directly contradicts the earlier report provided to trial counsel. Had counsel presented evidence of Appellant's mental condition at trial, the State would have had the opportunity to show that Appellant was a malingerer and had been found competent previously.

Further, trial counsel's decision to forego a defense based upon Appellant's mental health did not deprive Appellant of his only defense. At trial, Appellant's defense, as presented through his own testimony as well as that of several other witnesses, was that of "I did not do it."

In *Fisher v. State*, 736 P.2d at 1013, this Court stated that it would take appropriate action when defense counsel's pretrial preparation and investigation are so woefully inadequate as to undermine confidence in the outcome of the trial. In the present case, Appellant has failed to show that further investigation would have led to evidence which would have materially aided the defense so as to create a reasonable probability that the result of the trial would have been different.

■ It is important to remember that under State law, an accused is presumed to be competent to stand trial and the burden is on the accused to prove otherwise. 22 O.S.1981, § 1175.4(B). *See Doyle v. State*, 785 P.2d 317, 325 (Okl.Cr.1989). Although Appellant often exhibited violent and abusive behavior, we do not find that conduct sufficient to raise the issue of incompetency. If we were to take such a position, then every accused person who acted in a violent or abusive manner would be automatically entitled to a hearing to determine his competency to stand trial.

■ Reviewing counsel's overall performance during the first stage of trial, and the specific errors alleged by Appellant, we cannot say that he was denied effective assistance of counsel during the guilt-innocence phase of trial. We now turn to whether Appellant was denied effective assistance of counsel during the penalty phase of trial by counsel's failure to present any evidence of Appellant's mental condition. As we stated previously the State incorporated all of its first stage evidence and presented the testimony of three (3) women concerning specific acts of violence by the Appellant. The defense presented no evidence.

We have refused to apply a *per se* rule that the failure to present mitigating evidence in the second stage of a capital case constitutes ineffective assistance of counsel. *Fisher v. State*, 736 P.2d at 1014; *Coleman v. State*, 693 P.2d 4, 7 (Okl.Cr. 1984). *Stafford v. State*, 669 P.2d at 296. As in the instant case, the defense in *Fisher* chose not to present any second stage evidence. In finding that was not ineffective assistance of counsel, we held it significant that the court had instructed the jury on specific mitigating evidence.

In the present case, the jury was not prevented from considering relevant mitigating evidence offered by the defense as all the Appellant's first stage evidence was incorporated into the second stage. Further, the jury was instructed on eight (8)

minimum mitigating circumstances. These included, but were not limited to, that the murder was committed while the defendant was under the influence of mental or emotional disturbance; and that at the time of the murder, the capacity of the defendant to appreciate the criminality of his conduct or conform his conduct to the requirements of law was impaired as a result of mental disturbance or intoxication. The jury was also informed that it need not limit its consideration to the minimum mitigating circumstances listed, but may consider any evidence they determine to be mitigating. (O.R. 25–26)

Any evidence of Appellant's mental condition which trial counsel could have presented would have been cross-examined by the reports that the Appellant was a malingerer and had been previously determined competent. Counsel's strategy actually resulted in a windfall for the Appellant, as the jury was able to consider his mental health without hearing the evidence of his malingering tendencies.

Our review of the record shows that trial counsel deliberately limited his participation in the sentencing stage as a matter of trial strategy. Appellant has failed to rebut the presumption that the conduct of trial counsel might be considered sound trial strategy. Appellant has failed to show that, absent trial counsel's conduct in the sentencing stage, the jury would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. *Strickland,* 466 U.S. at 695, 104 S.Ct. at 2069.

Our evaluation of defense counsel's overall performance leads us to the conclusion that counsel made certain strategic choices based upon reasonable professional judgment. These strategic decisions resulted in the jury receiving evidence beneficial to the Appellant without the state being afforded an opportunity to dilute or contradict that evidence. Despite the denial of his request to be removed from the representation of Appellant and despite the lack of cooperation from Appellant, counsel competently represented his client. Appellant has failed to show that his sentence was rendered unreliable by a breakdown in the adversary process caused by deficiencies in counsel's conduct. Accordingly, we find that Appellant was not denied effective assistance of counsel and this assignment of error is denied.

## V. MANDATORY SENTENCE REVIEW

■ Pursuant to 21 O.S.Supp.1987, § 701.13(C), we must determine (1) whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor, and (2) whether the evidence supports the jury's finding of an aggravating circumstance as enumerated in 21 O.S.1981, § 701.12. Having reviewed the record, we cannot say the jury was influenced by passion, prejudice, or any other arbitrary factor contrary to 21 O.S. Supp.1987, § 701.13(C).

The jury found the existence of three aggravating circumstances: (1) the murder was especially heinous, atrocious or cruel; (2) the murder was committed for the purpose of avoiding arrest or lawful prosecution, and (3) the existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. We find that each aggravating circumstance was supported by sufficient evidence. 21 O.S.1981, § 701.12(4), (5) and (7).

Accordingly, finding no error warranting reversal or modification, the judgment and sentence for First Degree Murder is AFFIRMED.

LANE, P.J., and BRETT and JOHNSON, JJ., concur.

PARKS, J., specially concurs.

PARKS, Judge, specially concurring:

It continues to be the opinion of this writer that the ruling in *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), "must necessarily be extended to include any expert which is 'necessary for an adequate defense.'" *Ake v. State,* 778 P.2d 460, 464 n. 1 (Okl.Cr.1989). Before a defendant is entitled to such assistance, however, he must first make the requisite showing of need. *Id.* In the present case, I agree with the majority that "[a]ppellant failed to meet his burden of establishing the need for experts by neglecting to ex-

plain the undeveloped assertions contained in his motion." However, I cannot agree with the majority's additional assertion that cross-examination of the State's expert witnesses cures any error caused by the lack of expert witnesses for the defense.

In holding that *Ake* does not extend to experts other than psychiatrists, a majority of this Court in *Plunkett v. State,* 719 P.2d 834 (Okl.Cr.1986), explained that without such assistance "the risk of an inaccurate resolution of sanity issues is extremely high." *Id.* at 839. The majority then asserted:

> Such a risk in other areas of scientific evidence is not necessarily present because the scientific expert is often able to explain to the jury how a conclusion was reached, the defense counsel can attack that conclusion, and the jury can decide whether the conclusion has a sound basis.

*Id.* This general observation was transformed into a much more broad ruling in *Rojem v. State,* 753 P.2d 359 (Okl.Cr.1988), where the same majority stated that "scientific evidence is ordinarily not vulnerable to inaccurate resolution and in itself does not ordinarily call for a defense expert." *Id.* at 364.

Although I do not find the general remarks announced in *Plunkett* to be objectionable *per se,* it is my opinion that the holding in *Rojem,* relied upon by the majority herein, is over broad and subject to erroneous application. To illustrate this point, one need look no further than the trial of appellant's co-defendant. In *Fritz v. State,* 811 P.2d 1353 (Okl.Cr.1991), the State's forensic chemistry expert testified that twelve (12) hairs found at the crime scene were microscopically consistent with hairs from Fritz. *Id.* at 1362. However, the defense's hair expert examined the same evidence and concluded that only two (2) hairs were consistent with those from Fritz. *Id.* at 1362. Furthermore, regardless of the knowledge of a defense attorney on a particular scientific subject or the thoroughness of his cross-examination of a State's expert, such cannot reasonably be said to replace the testimony from a defense witness who is deemed to be an expert in his field.

I also wish to address the majority's declaration that "Pictures of the murder victim are always probative in establishing the *corpus delicti* of the crime." Majority at 400. While I agree, it should be stressed that before such photographs may be admitted into evidence, the proponent must demonstrate that they are relevant and that their probative value substantially outweighs their prejudicial effect. *See* Majority at 400.

Finally, I wish to reiterate my view that the so-called "anti-sympathy" instruction in the second stage is unnecessary and confusing to the jury where mitigating evidence has been introduced, *see Fox v. State,* 779 P.2d 562, 579 (Okl.Cr.1989) (Parks, P.J., concurring in part/dissenting in part), that the "continuing threat" aggravating circumstance should be more clearly defined, *see Boltz v. State,* 806 P.2d 1117, 1126–27, 62 OBJ 151, 156–57 (Okl.Cr. 1991) (Parks, P.J., specially concurring), and that the "especially heinous, atrocious or cruel" aggravating circumstance is unconstitutionally vague both on its face and as applied, *see Foster v. State,* 779 P.2d 591, 594 (Okl.Cr.1989) (Parks, P.J., specially concurring). As a matter of *stare decisis,* however, I must yield to the majority view regarding these issues.